## JOHNSON *v.* UNITED STATES

No. 99–5153.   Argued February 22, 2000—Decided May 15, 2000

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined, and in which KENNEDY, J., joined in part. KENNEDY, J., filed an opinion concurring in part, *post*, p. 713. THOMAS, J., filed an opinion concurring in the judgment, *post*, p. 715. SCALIA, J., filed a dissenting opinion, *post*, p. 715.

*Rita C. LaLumia* argued the cause for petitioner. With her on the briefs were *Leah J. Prewitt, David F. Ness, Jeffrey T. Green,* and *Joseph S. Miller.*

*Paul R. Q. Wolfson* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Deputy Solicitor General Dreeben,* and *Richard A. Friedman.**

JUSTICE SOUTER delivered the opinion of the Court.

The issue in this case grows out of an *Ex Post Facto* Clause challenge to the retroactive application of 18 U. S. C. § 3583(h), which authorizes a district court to impose an additional term of supervised release following the reimprisonment of those who violate the conditions of an initial term. The United States argues that district courts had the power to do so under the prior law, and that this cures any *ex post facto* problems. We agree with the Government as to the interpretation of prior law, and we find that consideration of the *Ex Post Facto* Clause is unnecessary.

I

In the Sentencing Reform Act of 1984, § 212(a)(2), 98 Stat. 1999, Congress eliminated most forms of parole in favor of

*____*

*\*Edward M. Chikofsky* and *Barbara E. Bergman* filed a brief for the National Association of Criminal Defense Lawyers et al. as *amici curiae* urging reversal.

supervised release, a form of postconfinement monitoring overseen by the sentencing court, rather than the Parole Commission. See *Gozlon-Peretz* v. *United States*, 498 U. S. 395, 400–401 (1991). The sentencing court was authorized to impose a term of supervised release to follow imprisonment, with the maximum length of the term varying according to the severity of the initial offense. See 18 U. S. C. §§ 3583(a), (b). While on supervised release, the offender was required to abide by certain conditions, some specified by statute and some imposable at the court's discretion. See § 3583(d). Upon violation of a condition, 18 U. S. C. § 3583(e)(3) (1988 ed., Supp. V) authorized the court to "revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release without credit for time previously served on post-release supervision . . . ."[1] Such was done here.

In October 1993, petitioner Cornell Johnson violated 18 U. S. C. § 1029(b)(2), a Class D felony. In March 1994, the United States District Court for the Eastern District of Tennessee sentenced him to 25 months' imprisonment, to be followed by three years of supervised release, the maximum term available under § 3583(b) for a Class D felony. Johnson was released from prison on August 14, 1995, having received good-conduct credits, and began serving his 3-year term of supervised release. Some seven months into that term, he was arrested in Virginia and later convicted of four state forgery-related offenses. He was thus found to have violated one of the conditions of supervised release made mandatory by § 3583(d), that he not commit another crime during his term of supervised release, and one imposed by the District Court, that he not leave the judicial district without permission.

---

[1] The current version of § 3583(e)(3) reads slightly differently, but for reasons discussed below, we focus on the law in effect at the time of Johnson's initial crime.

The District Court revoked Johnson's supervised release, imposed a prison term of 18 months, and ordered Johnson placed on supervised release for 12 months following imprisonment. App. 40–41. For this last order, the District Court did not identify the source of its authority, though under Circuit law it might have relied on § 3583(h), a subsection added to the statute in 1994, see Violent Crime Control and Law Enforcement Act of 1994, § 110505(2)(B), 108 Stat. 2017. Subsection (h) explicitly gave district courts the power to impose another term of supervised release following imprisonment, a power not readily apparent from the text of § 3583(e)(3) (set out *infra*, at 704).

Johnson appealed his sentence, arguing that § 3583(e)(3) gave district courts no such power and that applying § 3583(h) to him violated the *Ex Post Facto* Clause of the Constitution, Art. I, § 9. The Sixth Circuit, joining the majority of the Federal Courts of Appeals, had earlier taken Johnson's position as far as the interpretation of § 3583(e)(3) was concerned, holding that it did not authorize a district court to impose a new term of supervised release following revocation and reimprisonment. See *United States* v. *Truss,* 4 F. 3d 437 (CA6 1993).[2] It nonetheless affirmed the District Court, judgt. order reported at 181 F. 3d 105 (1999), reasoning that the application of § 3583(h) was not retroactive at all, since revocation of supervised release was punishment for Johnson's violation of the conditions of supervised

---

[2] Of the 11 Circuits to consider the issue, 9 had reached this conclusion. See, *e. g., United States* v. *Koehler,* 973 F. 2d 132 (CA2 1992); *United States* v. *Malesic,* 18 F. 3d 205 (CA3 1994); *United States* v. *Cooper,* 962 F. 2d 339 (CA4 1992); *United States* v. *Holmes,* 954 F. 2d 270 (CA5 1992); *United States* v. *Truss,* 4 F. 3d 437 (CA6 1993); *United States* v. *McGee,* 981 F. 2d 271 (CA7 1992); *United States* v. *Behnezhad,* 907 F. 2d 896 (CA9 1990); *United States* v. *Rockwell,* 984 F. 2d 1112 (CA10 1993); *United States* v. *Tatum,* 998 F. 2d 893 (CA11 1993). Two, the First and the Eighth, found that § 3583(e)(3) did grant district courts such power. See *United States* v. *O'Neil,* 11 F. 3d 292 (CA1 1993); *United States* v. *Schrader,* 973 F. 2d 623 (CA8 1992).

release, which occurred after the 1994 amendments. With no retroactivity, there could be no *Ex Post Facto* Clause violation. See App. 49 (citing *United States* v. *Abbington*, 144 F. 3d 1003, 1005 (CA6), cert. denied, 525 U. S. 933 (1998)). Other Circuits had held to the contrary, that revocation and reimprisonment were punishment for the original offense. From that perspective, application of § 3583(h) was retroactive and at odds with the *Ex Post Facto* Clause.[3] We granted certiorari to resolve the conflicts, 528 U. S. 950 (1999), and now affirm.

## II

The heart of the *Ex Post Facto* Clause, U. S. Const., Art. I, § 9, bars application of a law "that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed . . . ." *Calder* v. *Bull*, 3 Dall. 386, 390 (1798) (emphasis deleted). To prevail on this sort of *ex post facto* claim, Johnson must show both that the law he challenges operates retroactively (that it applies to conduct completed before its enactment) and that it raises the penalty from whatever the law provided when he acted. See *California Dept. of Corrections* v. *Morales*, 514 U. S. 499, 506–507, n. 3 (1995).

## A

The Sixth Circuit, as mentioned earlier, disposed of the *ex post facto* challenge by applying its earlier cases holding the application of § 3583(h) not retroactive at all: revocation

---

[3] See, *e. g., United States* v. *Eske*, 189 F. 3d 536, 539 (CA7 1999); *United States* v. *Lominac*, 144 F. 3d 308, 312 (CA4 1998); *United States* v. *Dozier*, 119 F. 3d 239, 241 (CA3 1997); *United States* v. *Collins*, 118 F. 3d 1394, 1397 (CA9 1997); *United States* v. *Meeks*, 25 F. 3d 1117, 1124 (CA2 1994) (addressing § 3583(g)). In contrast to these cases, the First and Eighth Circuits, relying on their broader construction of § 3583(e)(3), concluded that application of § 3583(h) did not violate the *Ex Post Facto* Clause. See *United States* v. *Sandoval*, 69 F. 3d 531 (CA1 1995) (unpublished), cert. denied, 519 U. S. 821 (1996); *United States* v. *St. John*, 92 F. 3d 761 (CA8 1996).

of supervised release "imposes punishment for defendants' new offenses for violating the conditions of their supervised release." *United States* v. *Page,* 131 F. 3d 1173, 1176 (1997). On this theory, that is, if the violation of the conditions of supervised release occurred after the enactment of § 3583(h), as Johnson's did, the new law could be given effect without applying it to events before its enactment.

While this understanding of revocation of supervised release has some intuitive appeal, the Government disavows it, and wisely so in view of the serious constitutional questions that would be raised by construing revocation and reimprisonment as punishment for the violation of the conditions of supervised release. Although such violations often lead to reimprisonment, the violative conduct need not be criminal and need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt. See 18 U. S. C. § 3583(e)(3) (1988 ed., Supp. V). Where the acts of violation are criminal in their own right, they may be the basis for separate prosecution, which would raise an issue of double jeopardy if the revocation of supervised release were also punishment for the same offense. Treating postrevocation sanctions as part of the penalty for the initial offense, however (as most courts have done), avoids these difficulties. See, *e. g., United States* v. *Wyatt,* 102 F. 3d 241, 244–245 (CA7 1996) (rejecting double jeopardy challenge on ground that sanctions for violating the conditions of supervised release are part of the original sentence); *United States* v. *Beals,* 87 F. 3d 854, 859–860 (CA7 1996) (noting that punishment for noncriminal violations must be justified by reference to original crimes), overruled on other grounds, *United States* v. *Withers,* 128 F. 3d 1167 (1997); *United States* v. *Meeks,* 25 F. 3d 1117, 1123 (CA2 1994) (noting absence of constitutional procedural protections in revocation proceedings). Cf. *Gagnon* v. *Scarpelli,* 411 U. S. 778, 782 (1973) ("Probation revocation . . . is not a stage of a crimi-

nal prosecution"). For that matter, such treatment is all but entailed by our summary affirmance of *Greenfield* v. *Scafati*, 277 F. Supp. 644 (Mass. 1967) (three-judge court), summarily aff'd, 390 U. S. 713 (1968), in which a three-judge panel forbade on *ex post facto* grounds the application of a Massachusetts statute imposing sanctions for violation of parole to a prisoner originally sentenced before its enactment. We therefore attribute postrevocation penalties to the original conviction.

B

Since postrevocation penalties relate to the original offense, to sentence Johnson to a further term of supervised release under § 3583(h) would be to apply this section retroactively (and to raise the remaining *ex post facto* question, whether that application makes him worse off). But before any such application (and constitutional test), there is a question that neither party addresses. The *Ex Post Facto* Clause raises to the constitutional level one of the most basic presumptions of our law: legislation, especially of the criminal sort, is not to be applied retroactively. See, *e. g., Lynce* v. *Mathis*, 519 U. S. 433, 439 (1997); *Landgraf* v. *USI Film Products*, 511 U. S. 244, 265 (1994). Quite independent of the question whether the *Ex Post Facto* Clause bars retroactive application of § 3583(h), then, there is the question whether Congress intended such application. Absent a clear statement of that intent, we do not give retroactive effect to statutes burdening private interests. See *id.*, at 270.

The Government offers nothing indicating congressional intent to apply § 3583(h) retroactively. The legislative decision to alter the rule of law established by the majority interpretation of § 3583(e)(3) (no authority for supervised release after revocation and reimprisonment) does not, by itself, tell us when or how that legislative decision was intended to take effect. See *Rivers* v. *Roadway Express*,

*Inc.*, 511 U. S. 298, 304–307 (1994). Neither is there any indication of retroactive purpose in the omission of an express effective date from the statute. The omission simply remits us to the general rule that when a statute has no effective date, "absent a clear direction by Congress to the contrary, [it] takes effect on the date of its enactment." *Gozlon-Peretz*, 498 U. S., at 404.[4]

Nor, finally, has Congress given us anything expressly identifying the relevant conduct in a way that would point to retroactive intent. It may well be that Congress, like the Sixth Circuit, believed that § 3583(h) would naturally govern sentencing proceedings for violations of supervised release that took place after the statute's enactment, simply because the violation was the occasion for imposing the sanctions.[5] But Congress gave us no clear indication to this effect, and we have already rejected that theory; the relevant conduct is the initial offense. In sum, there being no contrary intent, our longstanding presumption directs that § 3583(h) applies only to cases in which that initial offense occurred after the effective date of the amendment, September 13, 1994.

Given this conclusion, the case does not turn on whether Johnson is worse off under § 3583(h) than he previously was under § 3583(e)(3), as subsection (h) does not apply, and the *ex post facto* question does not arise. The case turns, in-

---

[4] Indeed, the Sentencing Guidelines identify the effective date of § 3583(h) as September 13, 1994. United States Sentencing Commission, Guidelines Manual § 7B1.3, comment., n. 2 (Nov. 1998) (USSG). So, too, have the federal courts. See, *e. g.*, *United States* v. *Hale*, 107 F. 3d 526, 529, n. 3 (CA7 1997).

[5] The failure to specify an effective date evidences at least arguable diffidence on this point. Another section of the same Act that added § 3583(h) amended 18 U. S. C. § 3553 to limit the applicability of some statutory minimum sentences. See § 80001, 108 Stat. 1985. That amendment, the section made explicit, "shall apply to all sentences imposed on or after the 10th day beginning after the date of enactment of this Act." § 80001(c), 108 Stat. 1986.

stead, simply on whether § 3583(e)(3) permitted imposition of supervised release following a recommitment.[6]

## III

· Section 3583(e), at the time of Johnson's conviction, authorized a district court to

"(1) terminate a term of supervised release and discharge the person released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the person released and the interest of justice;

"(2) extend a term of supervised release if less than the maximum authorized term was previously imposed, and . . . modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision;

---

[6] We took a similar approach in *Cisneros* v. *Alpine Ridge Group,* 508 U. S. 10 (1993). The respondents in that case were private developers who had entered into contracts with the Department of Housing and Urban Development. When the Department sought to recalibrate payments it owed under the contracts, the developers sued, and the Ninth Circuit ruled that the Department's proposed method of calculating payments was prohibited by the contracts. Congress subsequently passed legislation explicitly authorizing that method of calculation. The developers resisted application of that legislation to their contracts on the grounds that it retroactively deprived them of vested contractual rights, in violation of the Due Process Clause. We ruled (disagreeing with the Ninth Circuit's earlier holding) that the Department's methodology was acceptable under the contracts as signed. Finding the governmental action permitted by the old law, we declined to consider the constitutional consequences of a legislative attempt to change the applicable law.

> "(3) revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release without credit for the time previously served on postrelease supervision, if it finds by a preponderance of the evidence that the person violated a condition of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure that are applicable to probation revocation and to the provisions of applicable policy statements issued by the Sentencing Commission . . . ."

The text of subsection (e)(3) does not speak directly to the question whether a district court revoking a term of supervised release in favor of reimprisonment may require service of a further term of supervised release following the further incarceration. And if we were to concentrate exclusively on the verb "revoke," we would not detect any suggestion that the reincarceration might be followed by another term of supervised release, the conventional understanding of "revoke" being simply "to annul by recalling or taking back." Webster's Third New International Dictionary 1944 (1981). There are reasons, nonetheless, to think that the option of further supervised release was intended.

First, there are some textual reasons, starting with the preceding subsection (e)(1). This is an unequivocal provision for ending the term of supervised release without the possibility of its reimposition or continuation at a later time. Congress wrote that when a court finds that a defendant's conduct and the interests of justice warrant it, the court may "terminate a term of supervised release and discharge the person released," once at least a year of release time has been served. If application of subsection (3) had likewise been meant to conclude any possibility of supervised release later, it would have been natural for Congress to write in like terms. It could have provided that upon finding a defendant in violation of the release conditions the court could "terminate a term of supervised release" and order the de-

fendant incarcerated for a term as long as the original supervised release term. But that is not what Congress did. Instead of using "terminate" with the sense of finality just illustrated in subsection (1), Congress used the verb "revoke" and so at the least left the door open to a reading of subsection (3) that would not preclude further supervised release after the initial revocation.[7] In fact, the phrasing of subsection (3) did more than just leave the door open to the nonpreclusive reading.

As it was written before the 1994 amendments, subsection (3) did not provide (as it now does) that the court could revoke the release term and require service of a prison term equal to the maximum authorized length of a term of supervised release. It provided, rather, that the court could "revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release . . . ." So far as the text is concerned, it is not a "term of imprisonment" that is to be served, but all or part of "the term of supervised release." But if "the term of supervised release" is being served, in whole or part, in prison, then something about the term of supervised release survives the preceding order of revocation. While this sounds very metaphysical, the metaphysics make one thing clear: unlike a "terminated" order of supervised release, one

---

[7] The dissent offers an erudite explanation of the different senses of the two words, intending to demonstrate that Congress displayed "an admirably precise use of language," by using "revoke" to mean "annul" and "terminate" to indicate that "[t]he supervised release is treated as fulfilled, and the sentence is complete." *Post*, at 717 (opinion of SCALIA, J.). That is virtuoso lexicography, but it shows only that English is rich enough to give even textualists room for creative readings. This one encounters serious difficulties; the very same section of the statute (as in effect at the time of Johnson's offense) provides that if the person released is found in possession of a controlled substance, "the court shall terminate the term of supervised release and require the defendant to serve in prison not less than one-third of the term of supervised release." 18 U. S. C. §3583(g) (1988 ed.).

that is "revoked" continues to have some effect. And since it continues in some sense after revocation even when part of it is served in prison, why can the balance of it not remain effective as a term of supervised release when the reincarceration is over?[8]

Without more, we would have to admit that Congress had used "revoke" in an unconventional way in subsection (3), but it turns out that the unconventional sense is not unheard of. See *United States* v. *O'Neil*, 11 F. 3d 292, 295–296 (CA1 1993). Webster's Third New International Dictionary (our edition of which was issued three years before the 1984 Act) reveals that "revoke" can mean "to call or summon back," without the implication (here) that no further supervised release is subsequently possible. It gives "recall" as a synonym and comments that "RECALL in this sense indicates a calling back, suspending, or abrogating, either finally as erroneous or ill-advised or tentatively for deliberation . . . ." *Ibid.*[9] The unconventional dictionary definition is not, of

---

[8] JUSTICE SCALIA, *post*, at 721, thinks the "term" survives only as a measure of duration, but of course the statute does not read "require the person to serve a term in prison equal to all or part of the term of supervised release . . . ."

[9] While this sense is of course less common, the most recent editions of the most authoritative dictionaries do not tag it as rare or obsolete. The Oxford English Dictionary gives five examples of this usage, albeit hardly recent ones: three are drawn from the late 16th century and the most recent from 1784. 13 Oxford English Dictionary 838 (2d ed. 1989). But the OED is unabashedly antiquarian; of its examples for the more common meaning of "revoke," the most recent dates from 1873. *Ibid.* Webster's, it should be noted, includes the less common meaning, without antiquarian reproach, in its third edition. Webster's Third New International Dictionary 1944 (1981).

As JUSTICE SCALIA remarks, in relying on an uncommon sense of the word, we are departing from the rule of construction that prefers ordinary meaning, see *post*, at 715. But this is exactly what ought to happen when the ordinary meaning fails to fit the text and when the realization of clear congressional policy (here, favoring the ability to impose supervised release) is in tension with the result that customary interpretive rules would deliver. See, *e. g.*, *Commissioner* v. *Brown*, 380 U. S. 563, 571 (1965) (recognizing "some 'scope for adopting a restricted rather than a literal or

course, dispositive (although the emphasis placed upon it by JUSTICE SCALIA might suggest otherwise, see *post*, at 718–719). What it does do, however, is to soften the strangeness of Congress's unconventional sense of "revoke" as allowing a "revoked" term of supervised release to retain vitality after revocation. It shows that saying a "revoked" term of supervised release survives to be served in prison following the court's reconsideration of it is consistent with a secondary but recognized definition, and so is saying that any balance not served in prison may survive to be served out as supervised release.

A final textually based point is that the result of recognizing Congress's unconventional usage of "revoke" is far less remarkable even than the unconventional usage. Let us suppose that Congress had legislated in language that un-

---

usual meaning of its words where acceptance of that meaning . . . would thwart the obvious purpose of the statute'") (quoting *Helvering* v. *Hammel*, 311 U. S. 504, 510–511 (1941); *In re Chapman*, 166 U. S. 661, 667 (1897) ("[N]othing is better settled, than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion"). When text implies that a word is used in a secondary sense and clear legislative purpose is at stake, JUSTICE SCALIA's cocktail-party textualism, *post*, at 718, must yield to the Congress of the United States. (Not that we consider usage at a cocktail party a very sound general criterion of statutory meaning: a few nips from the flask might actually explain the solecism of the dissent's gunner who "revoked" his bird dog, *post*, at 719–720, n. 4; in sober moments he would know that dogs cannot be revoked, even though sentencing orders can be. His mistake, in any case, tells us nothing about how Congress may have used "revoke" in the statute. The gunner's error is, as JUSTICE SCALIA notes, one of current usage. (It is not merely that we do not "revoke" dogs in a "literal" sense today, as JUSTICE SCALIA puts it; we do not revoke them at all.) The question before us, however, is one of definition as distinct from usage: when Congress employed the modern usage in providing that a term of supervised release could be revoked, was it employing the most modern meaning of the term "revoke"? Usage can be a guide but not a master in answering a question of meaning like this one. JUSTICE SCALIA's argument from the current unacceptability of the dog and ox examples thus jeopardizes sound statutory construction rather more severely than his sportsman ever threatened a bird.)

equivocally supported the dissent, by writing subsection (3) to provide that the judge could "revoke" or "terminate" the term of supervised release and sentence the defendant to a further term of incarceration. There is no reason to think that under that regime the court would lack the power to impose a subsequent term of supervised release in accordance with its general sentencing authority under 18 U. S. C. § 3583(a). This section provides that "[t]he court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment . . . ." Thus, on the dissent's reading, when Johnson's supervised release was revoked and he was committed to prison, the District Court "impos[ed] a sentence to a term of imprisonment." See, e. g., App. 36, 39. And that sentence was, as already noted, imposed for his initial offense, the Class D felony violation of § 1029(b)(2). See supra, at 699–701. Nor would it be mere formalism to link the second prison sentence to the initial offense; the gravity of the initial offense determines the maximum term of reimprisonment, see § 3583(e)(3), just as it controls the maximum term of supervised release in the initial sentencing, see § 3583(b). Since on the dissent's understanding the resentencing proceeding would fall literally and sensibly within the terms of § 3583(a), a plain meaning approach would find authority for reimposition of supervised release there. Cf. United States v. Wesley, 81 F. 3d 482, 483–484 (CA4 1996) (finding that § 3583(a) grants power to impose a term of supervised release following reimprisonment at resentencing for violation of probation).

There is, then, nothing surprising about the consequences of our reading. The reading also enjoys the virtue of serving the evident congressional purpose. The congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition

from the prison to liberty. See, *e. g., United States* v. *Johnson, ante,* at 59 ("Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration"). The Senate Report was quite explicit about this, stating that the goal of supervised release is "to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release." S. Rep. No. 98–225, p. 124 (1983).

Prisoners may, of course, vary in the degree of help needed for successful reintegration. Supervised release departed from the parole system it replaced by giving district courts the freedom to provide postrelease supervision for those, and only those, who needed it. See *id.,* at 125 ("In effect, the term of supervised release provided by the bill takes the place of parole supervision under current law. Unlike current law, however, probation officers will only be supervising those releasees from prison who actually need supervision, and every releasee who does need supervision will receive it"). Congress aimed, then, to use the district courts' discretionary judgment to allocate supervision to those releasees who needed it most. But forbidding the reimposition of supervised release after revocation and reimprisonment would be fundamentally contrary to that scheme. A violation of the terms of supervised release tends to confirm the judgment that help was necessary, and if any prisoner might profit from the decompression stage of supervised release, no prisoner needs it more than one who has already tried liberty and failed. He is the problem case among problem cases, and a Congress asserting that "every releasee who does need supervision will receive it," *ibid.,* seems very un-

likely to have meant to compel the courts to wash their hands of the worst cases at the end of reimprisonment.[10]

The idea that a sentencing court should have authority to subject a reincarcerated prisoner to further supervised release has support, moreover, in the pre-Guidelines practice with respect to nondetentive monitoring, as illuminated in *United States* v. *O'Neil*, 11 F. 3d 292 (CA1 1993). The Sentencing Guidelines, after all, "represent an approach that begins with, and builds upon," pre-Guidelines law, see USSG, ch. 1, pt. A, intro. comment. 3, and when a new legal regime develops out of an identifiable predecessor, it is reasonable to look to the precursor in fathoming the new law. Cf. *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 432–434 (1987) (examining practice under precursor statute to determine meaning of amended statute).

Two sorts of nondetentive monitoring existed before the introduction of supervised release: probation and parole. Of these pre-Guidelines options, the one more closely analogous

---

[10] JUSTICE SCALIA attributes the strong preference for supervised release at the conclusion of a prison term to this Court, *post*, at 724, when that view of penal policy comes not from the Court but from Congress. The point is crucial. Our obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result. See, *e. g.*, *Holloway* v. *United States*, 526 U. S. 1, 9 (1999) (noting that statutory language should be interpreted in light of congressional policy); *Caron* v. *United States*, 524 U. S. 308, 315 (1998) (rejecting petitioner's reading of a statute because it "yields results contrary to a likely, and rational, congressional policy"). One who believes that courts must not look beyond text might well find any invocation of policy unjustified (even willful), at least when the policy does not rise unbidden from the words of the statute, but we have never treated the text as such a jealous guide and have traditionally sought to construe a statute so as to reach results consistent with what Chief Justice Taney called "its object and policy." See *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849). And in what Chief Justice Marshall called the attempt "to discover the design of the legislature," we have "seize[d] every thing from which aid can be derived." *United States* v. *Fisher*, 2 Cranch 358, 386 (1805).

to supervised release following imprisonment was parole, which by definition was a release under supervision of a parole officer following service of some term of incarceration. Courts have commented on the similarity. See, *e. g., Meeks,* 25 F. 3d, at 1121 ("[S]upervised release is essentially similar to parole"); *United States* v. *Paskow,* 11 F. 3d 873, 881 (CA9 1993) ("Supervised release and parole are virtually identical systems").

In thinking about this case, it is striking that the provisions of the former parole scheme dealing with the consequences of violating parole conditions repeatedly used the verb "revoke." See, *e. g.,* 18 U. S. C. § 4214(d)(5) (1982 ed.) (repealed 1984, Pub. L. 98–473, §§ 218(a)(5), 235, 98 Stat. 2027, 2031) (revocation of parole); 21 U. S. C. § 841(c) (1982 ed.) (repealed 1984) (revocation of special parole). And yet there seems never to have been a question that a new term of parole could follow a prison sentence imposed after revocation of an initial parole term.[11] See, *e. g.,* 28 CFR § 2.52(b)

---

[11] The same is true of special parole, part of the required sentence for certain drug offenses. Though the special parole statute did not explicitly authorize reimposition of special parole after revocation of the initial term and reimprisonment, the Parole Commission required it. See 28 CFR § 2.57(c) (1999). Some courts have recently decided that this regulation is inconsistent with 21 U. S. C. § 841(c) (1982 ed.), see, *e. g., Evans* v. *United States Parole Comm'n,* 78 F. 3d 262 (CA7 1996), but this does not affect the backdrop against which Congress legislated in 1984.

As for probation, the sentencing court's power to order a new term following revocation was the subject of some disagreement. The pre-Guidelines statute authorized the court to "revoke the probation and . . . impose any sentence which might originally have been imposed." 18 U. S. C. § 3653 (1982 ed.) (repealed). The statute thus clearly specified that the options for postrevocation sentencing were those available at the original sentencing; courts disputed only whether probation was a "sentence" that could be imposed. See *O'Neil,* 11 F. 3d, at 298–299 (collecting cases). The dispute over what counted as a sentence does not affect the broader point that a court's powers at the original sentencing are the baseline from which powers at resentencing are determined. Nor is our

(1999) (following revocation of parole, Sentencing Commission will determine whether reparole is warranted); *O'Neil,* *supra,* at 299; *United States Parole Comm'n* v. *Williams,* 54 F. 3d 820, 824 (CADC 1995) (noting "the established pre-Guidelines sentencing principle that parole is available unless expressly precluded" (citation and internal quotation marks omitted)).[12]  Thus, "revocation" of parole followed by further imprisonment was not a mere termination of a limited liberty that a defendant could experience only once per conviction, and it is fair to suppose that in the absence of any textual bar "revocation" of parole's replacement, supervised release, was meant to leave open the possibility of further supervised release, as well.

As seen already, "revoke" is no such bar, and we find no other.  The proceeding that follows a violation of the conditions of supervised release is not, to be sure, a precise reenactment of the initial sentencing.  Section 3583(e)(3) limits the possible prison term to the duration of the term of supervised release originally imposed.  (If less than the maximum has been imposed, a court presumably may, before revoking the term, extend it pursuant to § 3583(e)(2); this would allow the term of imprisonment to equal the term of supervised release authorized for the initial offense.)  The new prison term is limited further according to the gravity of the original offense.  See § 3583(e)(3).  But nothing in these specific

---

analysis of supervised release drawn into question by the fact that courts could not, for violations of probation, impose imprisonment followed by probation.  Probation, unlike supervised release, was an alternative to imprisonment.  Courts did not have the power to impose both at the original sentencing, so their inability to do so at subsequent sentencings is no surprise.

[12] The dissent seems to misconstrue our discussion of pre-Guidelines practice, see *post,* at 724–726, claiming that the practice is unilluminating because the possibility of parole inhered in any prison sentence.  But our point simply is that, metaphysics aside, Congress gave no indication that it thought supervised release after reincarceration would be less valuable than reparole after reincarceration had been.

provisions suggests that the possibility of supervised release following imprisonment was meant to be eliminated.[13]

In sum, from a purely textual perspective, the more plausible reading of § 3583(e)(3) before its amendment and the addition of subsection (h) leaves open the possibility of supervised release after reincarceration. Pre-Guidelines practice, linguistic continuity from the old scheme to the current one, and the obvious thrust of congressional sentencing policy confirm that, in applying the law as before the enactment of subsection (h), district courts have the authority to order terms of supervised release following reimprisonment. ·

The judgment of the Court of Appeals for the Sixth Circuit is

*Affirmed.*

JUSTICE KENNEDY, concurring in part.

The Court holds that 18 U. S. C. § 3583(e)(3), as it stood before the amendment adding what is now subsection (h), permits a trial court to impose further incarceration followed by a period of supervised release after revoking an earlier supervised release because the conditions were violated. In my view this is the correct result. The subsection permits a court to "require [a] person to serve in prison all or part of the term of supervised release" originally imposed. 18 U. S. C. § 3583(e)(3) (1988 ed., Supp. V). This indicates that after the right to be on supervised release has been revoked there is yet an unexpired term of supervised release that can be allocated, in the court's discretion, in whole or in part to confinement and to release on such terms and conditions

---

[13] Nor does our traditional rule of lenity in interpreting criminal statutes demand a contrary result. Lenity applies only when the equipoise of competing reasons cannot otherwise be resolved (not the case here), and in any event the rule of lenity would be Delphic in this case. There is simply no way to tell whether sentencing courts given the option of supervised release will generally be more or less lenient in fixing the second prison sentence.

as the court specifies. This was the convincing analysis adopted by the Court of Appeals for the First Circuit in reaching the same conclusion, and it suffices to resolve the case. See *United States* v. *O'Neil,* 11 F. 3d 292 (1993). The analysis, moreover, is no less fair than JUSTICE SCALIA's, *post,* at 722, n. 5 (dissenting opinion), which, after explaining at length that the only possible meaning of "revoke a term" is "'to annul'" it, *post,* at 715, to "'cancel'" it, *post,* at 716, and to treat it "as though it had never existed," *post,* at 717, explains away the statute's later inconvenient reference to "the term of supervised release" as "describ[ing] the *length* of the permitted imprisonment by reference to that now-defunct term of supervised release," *post,* at 721. This, of course, is not what the text says. Indeed, for support JUSTICE SCALIA turns to Congress' use of "terminate" in § 3583(g)—which JUSTICE SCALIA elsewhere concedes "was a mistake." *Post,* at 718, n. 2. Faced with a choice between two difficult readings of what all must admit is not optimal statutory text, the Court is correct to adopt the interpretation that makes the most sense.

I would not go on to suggest, as the Court does, that a court could extend a term of supervised release pursuant to § 3583(e)(2) prior to revoking the term under § 3583(e)(3). *Ante,* at 712. The subparts of § 3583(e) are phrased in the disjunctive; and § 3583(e)(3) must stand on its own. This suggests the term of imprisonment plus any further term of supervised release imposed under § 3583(e)(3) may not exceed the original term of supervised release that had been imposed and then violated.

Nor would I invoke 18 U. S. C. § 3583(a), *ante,* at 708, which raises more issues than it resolves, not the least of which is the description of the District Court's action as "imposing a sentence." Petitioner's sentence was imposed upon conviction. What is at issue in this case is the appropriate adjustment to make to that sentence when the prisoner has violated the conditions of supervised release.

With these observations I join the opinion of the Court, save for its parenthetical discussion of § 3583(e)(2), *ante*, at 712, and its dictum regarding § 3583(a), *ante*, at 708.

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court's textual analysis of 18 U. S. C. § 3583(e)(3) (1988 ed., Supp. V), and think that analysis sufficient to resolve this case. I agree with JUSTICE KENNEDY that the Court's discussions of § 3583(a), *ante*, at 707–708, and § 3583(e)(2), *ante*, at 712, are unnecessary to the result. I would not rely, as the Court (*ante*, at 708–710) and JUSTICE KENNEDY (*ante* this page (opinion concurring in part)) do, on any apparent congressional purpose supporting the Court's reading of § 3583(e)(3). With these observations, I concur in the judgment.

JUSTICE SCALIA, dissenting.

I agree with Parts I and II of the Court's opinion, and thus, like the Court, believe that the case ultimately turns on the meaning of 18 U. S. C. § 3583(e)(3) (1988 ed., Supp. V). I do not agree, however, with the Court's interpretation of that provision. The section provides that when the conditions of supervised release are violated, the court may "revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release without credit for time previously served on postrelease supervision." Finding in this an authorization for imposition of *additional* supervised release is an act of willpower rather than of judgment.

The term "revoke" is not defined by the statute, and thus should be construed "in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994). As the Court recognizes, the ordinary meaning of "revoke" is " 'to annul by recalling or taking back.' " *Ante*, at 704 (quoting Webster's Third New International Dictionary 1944 (1981)); see also American Heritage Dictionary 1545 (3d ed.

1992) (defining "revoke" as "[t]o void or annul by recalling, withdrawing, or reversing; cancel; rescind"). Under this reading, the "revoked" term of supervised release is simply canceled; and since there is no authorization for a new term of supervised release to replace the one that has been revoked, additional supervised release is unavailable.

The Court is not content with this natural reading, however, and proceeds to adopt what it calls an "unconventional" reading of "revoke," *ante*, at 706, as meaning "to call or summon back" without annulling, *ibid.*[1] It thereby concludes that the revoked term of supervised release retains some effect, and thus that additional supervised release may be required after reimprisonment. The Court suggests that its abandonment of ordinary meaning is justified by the text, by congressional purpose, and by analogy to pre-Guidelines practice regarding nondetentive monitoring. None of the proffered reasons is convincing.

The Court claims textual support for its "unconventional" reading in the fact that subsection (e)(3), at issue here, uses the term "revoke," while subsection (e)(1) uses the term "terminate." Since, the Court reasons, the two terms should not be interpreted to have exactly the same meaning, (1) the statute must intend a "less common" meaning of "revoke," namely, "call back," see *ante*, at 706, and n. 9; and (2) this "less common" meaning authorizes the later imposition of supervised release. Each part of this two-step analysis is patently false.

---

[1] Describing the Court's reading as "unconventional" makes it sound perfectly O. K. There are, after all, unconventional houses, unconventional hairdos, even unconventional batting stances, all of which are fine. Houses, hairdos, and batting stances, however, have an independent existence apart from convention, whereas words are nothing but a convention—particular sounds which by agreement represent particular concepts, and (in the case of most written languages) particular symbols which by agreement represent particular sounds. Thus, when the Court admits that it is giving the word "revoke" an "unconventional" meaning, it says that it is choosing to ignore the word "revoke."

As to the first: The usual, ordinary-English definition of "revoke" is already amply distinguishable from "terminate," and does not have to be tortured into Old English (or actually, transliteration from Old Latin) in order to explain the choice of words. "Terminate" connotes completion rather than cancellation. See American Heritage Dictionary 1852 (3d ed. 1992) (defining "terminate" as "[t]o bring to an end or a halt" or "[t]o occur at or form the end of; conclude or finish"); Webster's New International Dictionary 2605 (2d ed. 1942) (defining "terminate" as "[t]o put an end to; to make to cease; to end . . . to form the conclusion of . . ."). Using "terminate" in subsection (e)(1) and "revoke" (in its ordinary sense) in subsection (e)(3) is not only not inexplicable; it reflects an admirably precise use of language. In subsection (e)(1), the term of supervised release is "terminated" ("brought to an end") because termination is warranted "by the conduct of the defendant released and the interest of justice." The supervised release is treated as fulfilled, and the sentence is complete. In subsection (e)(3), by contrast, the supervised release term is not merely brought to an end; it is annulled and treated as though it had never existed, the defendant receiving no credit for any supervised release served. It would be hard to pick two words more clearly connoting these distinct consequences than "terminate" and "revoke."[2]

---

[2] The Court is correct, *ante*, at 705, n. 7, that my suggested explanation of the difference between "terminate" and "revoke" does not comport with the use of "terminate" in § 3583(g). But the use of the term in that subsection *also* contradicts *the Court's* explanation of the difference between the two terms—viz., that "terminate," unlike in its view "revoke," "conclude[s] any possibility of supervised release later," *ante*, at 704. For the Court evidently believes (contrary to the use of "terminate" in § 3583(g)) that further supervised release is available when a supervisee is reimprisoned for possession of a controlled substance. It would be "fundamentally contrary" to the congressional scheme, the Court asserts, if supervised release following reimprisonment were not available for "one who has already tried liberty and failed," *ante*, at 709. But the use of "terminate" in

The first step of the Court's analysis—its inference that the use of "terminate" in subsection (e)(1) requires its alternative meaning of "revoke" in subsection (e)(3)—is also wrong because the alternative meaning that the Court posits ("to call or summon back," without the implication of annulment, *ante*, at 706) is not merely (as the Court says) "less common," *ante*, at 706, n. 9; in the context that is relevant here, it is utterly unheard of. One can "call or summon back" a person or thing without implication of annulment, but it is quite impossible to "call or summon back" an order or decree without that implication—which is precisely why the primary meaning of revoke has shifted from its root meaning ("call or summon back") to the meaning that it bears in its most common context, *i. e.*, when applied to orders or decrees ("cancel or annul"). Of course the acid test of whether a word can reasonably bear a particular meaning is whether you could use the word in that sense at a cocktail party without having people look at you funny. The Court's assigned meaning would surely fail that test, even late in the evening. Try telling someone, "Though I do not cancel or annul my earlier action, I revoke it." The notion that Con-

§ 3583(g) prescribes just that. Further, § 3583(g) undermines the Court's argument that because § 3583(e)(3) authorizes the court to "revoke a term of supervised release" and then to require "all or part of the term" to be served in prison, the revoked term must retain some metaphysical vitality. See *ante*, at 705–706. This is so because § 3583(g) provides that the court shall "terminate the term of supervised release" (hence extinguishing it even in the Court's view), and yet goes on to provide that the court shall require the defendant to serve at least one-third of "the term of supervised release" in prison. See *infra*, at 721. So on either the Court's interpretation of the difference between "terminate" and "revoke" or on mine, the use of "terminate" in § 3583(g) was a mistake—which is why Congress has since amended it to read "revoke." See § 110505, 108 Stat. 2017. See also Brief for United States 25, n. 20 ("Congress apprehended that the term 'terminate' was inappropriate [in § 3583(g)]"). If we both concede it was a mistake, that leaves my explanation of the difference between "terminate" in § 3583(e)(1) and "revoke" in § 3583(e)(3) uncontradicted.

gress, by the phrase "revoke a term of supervised release," meant "recall but not cancel a term of supervised release" is both linguistically and conceptually absurd.

The dictionary support that the Court seeks to enlist for its definition is fictitious. It is indeed the case that both the Oxford English Dictionary and Webster's Third New International Dictionary give as a meaning of "revoke" "to call or summon back"; but neither of them adds the fillip that is essential to the Court's point—that the thing called back "retain vitality." *Ante*, at 707. They say nothing at all about the implication of calling or summoning back—which, in the case of calling or summoning back an order or decree, is necessarily annulment.[3] Further, while the dictionaries the Court mentions do not give its chosen meaning "antiquarian reproach," *ante*, at 706, n. 9, many dictionaries do. The New Shorter Oxford shows this usage as obsolete, see New Shorter Oxford English Dictionary 2583 (1993), and the previous edition of Webster's New International shows it as rare, see Webster's New International Dictionary 2134 (2d ed. 1942). Other dictionaries also show the Court's chosen meaning as rare, *e. g.*, Chambers English Dictionary 1257 (1988), as obsolete or archaic, *e. g.*, Cassell Concise English Dictionary 1149 (1992); Funk and Wagnalls New Standard Dictionary 2104 (1957), or do not give it as a meaning at all, *e. g.*, American Heritage Dictionary 1545 (3d ed. 1992).[4]

---

[3] As the Court suggests in its quotation of Webster's Third's definition of "RECALL," see *ante*, at 706, the annulment may be only temporary (a "suspension"); but that is so only if there is some authority for repromulgation after the revocation—which leaves the Court no further along than it was before it dipped into the more obscure meanings of "revoke": it must identify some authority to reimpose supervised release. This blends into the next point made in text.

[4] Whether one attributes any currency to "revoke" in the sense of "call back" depends, I think, on whether one counts as current usage *figurative* usage. The OED, while not showing the meaning "to call back" as obsolete, does indicate that its current usage is "chiefly fig[urative]." 13 Ox-

As for the second step of the Court's analysis: Even if there were justification for giving "revoke" something other than its normal meaning, and even if the meaning the Court adopts were not unheard of, the latter meaning *still* does not provide the needed authorization for reimposition of supervised release. The statute does not say that the court may "revoke" ("call back," as the Court would have it) only *part* of the term of supervised release, so there is no argument that some portion remains in place for later use. Thus, even if "revoke" means "call back," a court would need statutory authorization to reimpose this "called back" term of supervised release. But § 3583(e)(3) provides no such authorization. The court is empowered to "revoke" the term; it is empowered to require that "all or part" of the term be served in prison; it is not empowered to reimpose "all or part" of the term as a later term of supervised release.

---

ford English Dictionary 838 (2d ed. 1989) (OED). Just as current usage would allow one to say that "the emperor called back his decree," so also it would allow one to say that the emperor "revoked" his decree *in that figurative sense* of "calling it back"—*i. e.,* in the sense of canceling it. It is assuredly *not* current usage, however—I think not even *rare* current usage—to use "revoke" to connote a literal calling back. ("Since my bird dog was ranging too far afield, I revoked him.")

The Court chastises this example, suggesting that only a tippling hunter would "revoke" his bird dog, as "dogs cannot be revoked, even though sentencing orders can be." *Ante,* at 707, n. 9. I could not agree more. However, the definition the Court employs ("call back" without the implication of cancellation) envisions that dogs *can* be revoked—thus illustrating its obscurity. The OED definition on which the Court relies, see *ante,* at 706, n. 9, defines "revoke" as "to recall; to call or summon back . . . an animal or thing." 13 OED 838 (2d ed. 1989). The first example it gives of this usage is as follows: "These hounds . . . being acquainted with their masters watchwordes, eyther in revoking or imboldening them to serve the game." *Ibid.* Of course the Court's "not unheard of" usage, *ante,* at 706, is not limited to recalling dogs—oxen can be revoked as well, as the OED's third example illustrates: "Ye must revoke The patient Oxe unto the Yoke." 13 OED 838.

The Court opines that no authorization for further supervised release is needed, because the fact that the district court may require "all or part of the term of supervised release" to be served in prison demonstrates that the revoked term continues to have some metaphysical effect, *ante*, at 705–706, so that "the balance of it [can] remain effective as a term of supervised release when the reincarceration is over," *ante*, at 706. It demonstrates no such thing. In allowing the district court to require that "all or part of the term of supervised release" be spent in prison, the statute simply describes the *length* of the permitted imprisonment by reference to that now-defunct term of supervised release. It is quite beyond me how the Court can believe that the statute "does not read" this way, *ante*, at 706, n. 8, and the concurrence that "[t]his . . . is not what the text says," *ante*, at 714. A "term of supervised release" in what might be called the *substantive* rather than the *temporal* sense—*i. e.*, the sentence to a period of supervised release—cannot possibly be served in prison. To be in prison is not to be released. The *only* sense in which "all or part of the term of supervised release" can be served in prison is the temporal sense. Cf. *United States* v. *Johnson, ante*, at 57 ("To say respondent was released while still imprisoned diminishes the concept the word intends to convey"). The Court's unrealistic reading is also undermined by the fact that § 3583(g) provides for serving in prison part of "the term of supervised release," in spite of the fact that the term there has been "terminated," so that even the Court would not claim it has ongoing vitality. See n. 2, *supra*. And finally, in concluding that the term of supervised release remains in place, the Court essentially reads the phrase "revoke a term of supervised release" out of the statute, treating the subsection as if it did no more than authorize the court to "require the person to serve in prison all or part of the term of supervised release" originally imposed, § 3583(e)(3). Of course the statute could have been drafted to say just that—allowing the court to require

part of the term of supervised release to be served in prison, with the rest of the term remaining in place to be served on supervised release. In the text actually adopted, however, the supervised-release term is *not* left in place, but is explicitly "revoked."[5]

Further, if one assumes, as the Court does, that a revoked term somehow "survives the . . . order of revocation," *ante*, at 705, and retains effect (even without any statutory authorization for reimposition or reactivation), then it would follow that whatever part of it is not required to be served in prison is *necessarily* still in effect. Thus the district court would have no discretion *not* to require the remainder of the term to be served on supervised release. Yet the Court seems to view further supervised release as only an "option." *Ante*, at 704, 713, n. 13; accord, *ante*, at 713–714 (KENNEDY, J., concurring in part).

The Court's confusing discussion of how § 3583(a) would produce consequences similar to those its opinion achieves— and consequences that are entirely reasonable—*if* § 3583(e)(3) read differently from the way it does read, *ante*, at 707–708, is entirely irrelevant. I do not contend that the result the Court reaches is any way remarkable, only that it is not the result called for by the statute. The Court carefully *does not* maintain—and it *could* not, for reasons I need not describe—that subsection (a) justifies imposition of post-

---

[5] The concurrence adjusts for that inconvenient fact by simply changing the object of the verb, concluding that "after *the right to be on supervised release has been revoked* there is yet an unexpired term of supervised release that can be allocated . . . in whole or in part to confinement and to release . . . ." *Ante*, at 713 (KENNEDY, J., concurring in part) (emphasis added). The statute, however, does not revoke "the right to be on supervised release"; it revokes the "term of supervised release" itself, see § 3583(e)(3), which is utterly incompatible with the notion that the term remains in place. Switching the object of "revoke" is no fair in itself, and it leaves the provision entirely redundant, since revoking "the right to be on supervised release" adds nothing to "requir[ing] the person to serve in prison all or part of the term," § 3583(e)(3).

revocation supervisory release given the *actual* text of subsection (e)(3), and nothing more is pertinent here. Hypothetical discussion of what role § 3583(a) might play had Congress legislated differently is beside the point.

The Court next turns to questions of policy—framed as an inquiry into "congressional purpose." *Ante*, at 708. Citing legislative history (although not legislative history discussing the particular subsection at issue), *ante*, at 709–710, the Court explains what it views as the policies Congress seeks to serve with supervised release generally, and then explains how these general policies would be undermined by reading § 3583(e)(3) as written. "Our obligation," the Court says, "is to give effect to congressional purpose so long as the congressional language does not itself bar that result." *Ante*, at 710, n. 10. I think not. Our obligation is to go as far in achieving the general congressional purpose as the text of the statute fairly prescribes—and no further. We stop where the statutory language does, and do not require explicit prohibition of our carrying the ball a few yards beyond. In any event, as read by any English speaker except one who talks of revoking a dog, the statute does "bar" the result the Court reaches here. The proper canon to govern the present case is quite simple: "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms,'" *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989) (quoting *Caminetti* v. *United States*, 242 U. S. 470, 485 (1917)).

Perhaps there is a scrivener's error exception to that canon, see, *e. g.*, *Holloway* v. *United States*, 526 U. S. 1, 19, n. 2 (1999) (SCALIA, J., dissenting); *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504, 527–528 (1989) (SCALIA, J., concurring in judgment), but the words of today's author in another case well describe why that is inapplicable here: "This case is a far cry from the rare one where the effect of implementing the ordinary meaning of the statutory text would be patent absurdity or demonstrably at odds with the inten-

tions of its drafters." *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 563 (1994) (SOUTER, J., dissenting) (citations and internal quotation marks omitted). It would have been entirely reasonable for Congress to conclude that a prisoner who had broken the terms of supervised release seriously enough to be reincarcerated should not be trusted in that status again; and that a judge should not be tempted to impose an inappropriately short period of reimprisonment by the availability of further supervised release. Congress might also have wished to eliminate the unattractive prospect that a prisoner would go through one or even more repetitions of the violation-reimprisonment-supervised-release sequence—which is avoided by requiring the district court confronted with a violation either to leave the prisoner on supervised release (perhaps with tightened conditions and lengthened term, as § 3583(e)(2) permits) or to impose imprisonment, but not to combine the two. Because the interpretation demanded by the text is an entirely plausible one, this Court's views of what is prudent policy are beside the point. And that is so whether those policy views are forthrightly stated as such ("[I]f any prisoner might profit from the decompression stage of supervised release, no prisoner needs it more than one who has already tried liberty and failed," *ante*, at 709), or whether, to give an interpretive odor to the opinion, they are recast as policies that it "seems very unlikely" for Congress to have intended ("Congress . . . seems very unlikely to have meant to compel the courts to wash their hands of the worst cases at the end of reimprisonment," *ante*, at 709–710).

Finally, the Court appeals to pre-Guidelines practice with regard to nondetentive monitoring. But this cannot cure the lack of statutory authorization for additional supervised release. Even if the language of § 3583(e)(3) were ambiguous (which it is not), that history would be of little relevance, since the Sentencing Reform Act's adoption of supervised release was meant to make a significant break with prior

practice, see *Mistretta* v. *United States*, 488 U. S. 361, 366 (1989) (describing the Act's "sweeping reforms"); *Gozlon-Peretz* v. *United States*, 498 U. S. 395, 407 (1991) ("Supervised release is a unique method of postconfinement supervision invented by the Congress for a series of sentencing reforms").[6] The Court's effort to equate parole and supervised release, *ante*, at 710–712, is unpersuasive. Unlike parole, which replaced a portion of a defendant's prison sentence, supervised release is a separate term imposed at the time of initial sentencing. Compare 18 U. S. C. § 3583(a) with 18 U. S. C. §§ 4205(a), 4206 (1982 ed.) (repealed); see also USSG ch. 7, pt. A, intro. comment. 2(b). This distinction has important consequences for the present question, since when parole was "revoked" (unlike when supervised release is revoked), there was no need to impose a new term of imprisonment; the term currently being served (on parole) was still in place. Similarly, there was no occasion to impose a new term of parole, since the possibility of parole was inherent in the remaining sentence. See 18 U. S. C. § 4205(a) (1982 ed.) ("Whenever confined and serving a definite term

---

[6] United States Sentencing Commission, Guidelines Manual ch. 1, pt. A, intro. comment. 3 (Nov. 1998) (USSG), is not to the contrary. The Court quotes the comment for the broad proposition that "[t]he Sentencing Guidelines, after all, 'represent an approach that begins with, and builds upon,' pre-Guidelines law." *Ante*, at 710. The comment itself, however, makes the much more narrow point that data on sentences imposed pre-Guidelines were used as a "starting point" in devising sentencing ranges under the Guidelines. The sentence from which the Court quotes states: "Despite . . . policy-oriented departures from pre-guidelines practice, the guidelines represent an approach that begins with, and builds upon, empirical data." USSG ch. 1, pt. A, intro. comment. 3. This sheds no light on the extent to which prior practice in matters other than length of sentence underlay the Guidelines, much less on the extent to which such prior practice is a meaningful guide to statutory interpretation in general—and even less to statutory interpretation pertaining to supervised release, which the Guidelines elsewhere refer to as "a new form of post-imprisonment supervision created by the Sentencing Reform Act," *id.*, ch. 7, pt. A, intro. comment. 2(b).

or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term . . .").  The question whether further supervised release may be required after revocation of supervised release is so entirely different from the question whether further parole may be accorded after revocation of parole, that the Court's appeal to the parole practice demonstrates nothing except the dire scarcity of arguments available to support its conclusion.[7]

---

[7] The Court also appeals to pre-Guidelines practice regarding probation and special parole.  *Ante*, at 711–712, n. 11.  The pre-Guidelines probation practice is altogether inapt, since the governing statute explicitly provided for resentencing after violation, and specifically allowed the court to "impose any sentence which might originally have been imposed."  18 U. S. C. § 3653 (1982 ed.) (repealed).  This makes it quite impossible for probation practice to support the Court's "broader point that a court's powers at the original sentencing are the baseline from which powers at resentencing are determined," *ante*, at 711, n. 11; all it proves is that they are the baseline where the statute says so.  Indeed, the fact that the statute found it necessary to say so tends to contradict the Court's position.

Special parole, while more akin to supervised release than either parole or probation, hardly provides clear support for the Court's reading of § 3583(e)(3).  In fact, the majority of Courts of Appeals have read the relevant statute regarding special parole, 21 U. S. C. § 841(c) (1982 ed.) (repealed), as not allowing reimposition of special parole in circumstances analogous to those at issue here.  See *Manso* v. *Federal Detention Center*, 182 F. 3d 814, 817 (CA11 1999) (citing cases).  The Court's reliance on the Parole Commission's 1977 interpretation of the special parole statute, see 28 CFR § 2.57(c) (1999), is misplaced.  The principle that Congress is presumed to legislate in light of existing administrative interpretations does not stretch to cover an administrative interpretation of a statute dealing with a different subject, of recent vintage, and unsupported by judicial opinion.  Cf. *Bragdon* v. *Abbott*, 524 U. S. 624, 645 (1998) (repetition of existing statutory language assumed to incorporate "uniform body of administrative and judicial precedent" that had "settled the meaning" of existing provision); *Haig* v. *Agee*, 453 U. S. 280, 297 (1981) (assuming congressional awareness of "longstanding administrative construction").  Further, some courts have found it unclear whether the Parole Commission's regulation itself envisions reimposition of special parole.  See, *e. g.*, *Fowler* v. *United States Parole Commission*, 94 F. 3d 835, 841 (CA3 1996).

\*　　\*　　\*

This is not an important case, since it deals with the interpretation of a statute that has been amended to eliminate, for the future, the issue we today resolve. But an institution that is careless in small things is more likely to be careless in large ones; and an institution that is willful in small things is almost certain to be willful in large ones. The fact that nothing but the Court's views of policy and "congressional purpose" supports today's judgment is a matter of great concern, if only because of what it tells district and circuit judges. The overwhelming majority of the Courts of Appeals—9 out of 11—notwithstanding what they might have viewed as the more desirable policy arrangement, reached the result unambiguously demanded by the statutory text. See *ante,* at 698, n. 2. Today's decision invites them to return to headier days of not-too-yore, when laws meant what judges knew they ought to mean. I dissent.