[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 9, 2009
THOMAS K. KAHN
CLERK

No. 09-10550
Non-Argument Calendar

_____

D. C. Docket No. 07-00067-CR-AAA-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROY ANTHONY PRUITT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(September 9, 2009)

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

After pleading guilty, Roy Anthony Pruitt appeals his 78-month sentence for bank robbery.  After review, we affirm.

## I. DISCUSSION

Pursuant to a written plea agreement, Pruitt pled guilty to bank robbery, in violation of 18 U.S.C. § 2113(a).  The government agreed not to object to a recommendation that Pruitt receive an acceptance-of-responsibility reduction if he "truthfully admits the conduct comprising the offense of conviction."

The Presentence Investigation Report ("PSI") outlined the offense conduct as follows.  On October 1, 2007, Pruitt entered a SunTrust Bank branch located inside a Publix supermarket in Brunswick, Georgia.  Pruitt approached the bank teller, Gabriel Jimenez, and handed him an envelope with a demand note, stating:

Do not panic!

This man is a pawn.  We have his wife and child.  He have been told to leave the package he carrying with you.  There is 2 sets of eyes on you and him.  Along with this letter place in envelope –

1 pak of 100's (10,000 Dollars)
1 pak of 20's + cash in drawer.

No ink paks, tracking device or alarms for 10 minutes.  Do not follow him.

Cooperate or boom and bang!  We are watching and listening.[1]

_____

[1]We quote the text from the copy of the demand note that was attached to the PSI addendum.  There are a few minor discrepancies between this language and the PSI's recitation

2

Jimenez filled the envelope with $5,375.01. Pruitt took the envelope and fled from the SunTrust Bank on foot. In December 2007, Pruitt was arrested in South Carolina and confessed to the bank robbery.

Bank teller Rhonda Diggs was in close proximity to Jimenez and observed Pruitt giving the envelope to Jimenez. According to Diggs, defendant Pruitt verbally informed her and Jimenez that there were "black guys" watching them who had driven him from Florida to rob banks. Defendant Pruitt stated that the "black guys" were holding his family captive and were threatening to kill them if he did not follow their commands. Pruitt also told Diggs and Jimenez that "if they did not give him the money then 'boom, you are dead.'" Jimenez also said Pruitt "threatened several times that if [Jimenez and Diggs] did not cooperate they would die."

The PSI calculated a base offense level of 20, pursuant to U.S.S.G. § 2B3.1(a). The PSI also applied (1) a two-level increase, pursuant to § 2B3.1(b)(1), because the property of a financial institution was taken, and (2) a two-level increase, pursuant to § 2B3.1(b)(2)(F), because Pruitt made a threat of death. The PSI recommended a two-level acceptance-of-responsibility reduction, pursuant to U.S.S.G. § 3E1.1(a), but stated that the government had advised that it

of the demand note so we quote from the note itself.

3

would not move for an additional one-level reduction, pursuant to § 3E1.1(b).  This resulted in a total offense level of 22.

The PSI determined that Pruitt had a criminal history category of IV based on eight criminal history points.  First, the PSI calculated three points for Pruitt's 1999 conviction for breach of trust.  Second, the PSI calculated three criminal history points based on a three-year sentence imposed in January 2008 upon revocation of Pruitt's state probation on a fraudulent check conviction.  More specifically, in June 2006, Pruitt was convicted in South Carolina for presenting a fraudulent check and was sentenced to five years' imprisonment, suspended during probation.  In February 2007, a state warrant was issued for Pruitt's arrest due to his failure to report, to pay a supervision fee and restitution, and to follow the advice and instructions of the state probation officer.  Thus, a state probation warrant was issued before Pruitt's October 1, 2007 bank robbery.  In December 2007, Pruitt was arrested on that February 2007 probation violation warrant.  In January 2008, his state probation was revoked based on technical probation violations, and he was sentenced to three years' imprisonment on his fraudulent check conviction.

Finally, the PSI calculated two criminal history points because Pruitt committed the instant bank robbery offense on October 1, 2007 while on his

4

probation. Based on a total offense of 22 and a criminal history category of IV, the PSI calculated an advisory guidelines range of 63 to 78 months' imprisonment.

Pruitt objected, inter alia, to the two-level threat-of-death enhancement and to the criminal history category calculation. Before the sentencing hearing, the government filed a memorandum stating, inter alia, that it would not move the court to grant Pruitt an additional one-level reduction for acceptance of responsibility under § 3E1.1(b) because he denied making any death threats to the bank tellers.

At the sentencing hearing in January 2009, Pruitt's counsel reiterated his objection to the PSI's assertion that Pruitt verbally threatened the bank tellers. In response, the government presented testimony from Federal Bureau of Investigation Special Agent Mark Alig, who responded to the SunTrust Bank robbery. Agent Alig stated that bank teller Jimenez said that "when he asked the Defendant about the statement here, that cooperate or boom and bang, we are watching and listening, Mr. Jimenez repeated that aloud and he said the Defendant immediately said there are two black men inside this bank that are watching you and there is one outside and if you do not cooperate, boom." Agent Alig testified that bank teller Diggs overheard Pruitt saying this. According to Agent Alig,

Diggs and Jimenez repeated these threats to other officers at the scene of the bank robbery and this was reflected in the officers' supplemental reports.

After Pruitt's counsel objected that Agent Alig's testimony was hearsay, Alig testified that the tellers' statements regarding Pruitt's verbal death threat were repeated and corroborated and that he had no reason to disbelieve them. However, Agent Alig acknowledged that neither of the tellers mentioned Pruitt's threat in the internal reports they prepared for SunTrust Bank after the robbery. Agent Alig also acknowledged that the officers' supplemental reports did not say that Pruitt said anyone was going to die or specify at whom the threat was directed.

With respect to the contested PSI facts regarding the threats to the bank tellers, the district court found that "the position of the probation officer is much more credible than the evidence to the contrary by a preponderance" and expressly adopted the probation officer's factual account as stated in the PSI addendum. The district court also stated that it concurred with the probation officer's response to Pruitt's guidelines calculations. The district court adopted the PSI's factual findings and advisory guidelines calculations and sentenced Pruitt to 78 months' imprisonment, the high-end of the applicable advisory guidelines range.

## II. DISCUSSION

### A.  Threat-of-Death Enhancement

Pruitt argues that the district court erred by applying a two-level threat-of-death enhancement under U.S.S.G. § 2B3.1(b)(2)(F).[2]  A defendant's base offense level is increased by two levels "if a threat of death was made."  U.S.S.G. § 2B3.1(b)(2)(F).  The guidelines commentary explains this enhancement, as follows:

> "A threat of death," as used in subsection (b)(2)(F), may be in the form of an oral or written statement, act, gesture, or combination thereof. Accordingly, the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply. . . . The court should consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death.

U.S.S.G. § 2B3.1 cmt. n.6.  In applying U.S.S.G. § 2B3.1(b)(2)(F), "[w]e do not understand the robber's intent to be determinative.  It is the impact of his message on reasonable hearers that is important."  United States v. Murphy, 306 F.3d 1087, 1089 n.1 (11th Cir. 2002).

Here, we cannot say that the district court clearly erred in applying the two-level threat-of-death enhancement in light of the demand note and Pruitt's verbal statements to the tellers.  The demand note informed the teller that: (1) "There is 2 sets of eyes on you and [Pruitt]," (2) "We are watching and listening," and (3)

---

[2]This Court reviews a district court's factual findings for clear error and its application of the Sentencing Guidelines to those facts de novo.  United States v. Phillips, 413 F.3d 1288, 1292 (11th Cir. 2005).

"Cooperate or boom and bang!" A reasonable bank teller would have received this note and concluded: If I do not give the money requested, then there are two people watching and listening who will either detonate a bomb or shoot me and I will die. See Murphy, 306 F.3d at 1089 (concluding that a reasonable bank teller's interpretation of a note stating that the teller had ten seconds to hand the Defendant all the money in the top drawer and that the Defendant had a gun was "If I do not give this robber money within ten seconds, I will be shot; and people who are shot often die."). The fact that the demand note did not expressly state that Pruitt or the two observers intended to kill the bank teller does not preclude this fact finding. See U.S.S.G. § 2B3.1 cmt. n.6 ("[T]he defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply."). Nor does the fact that the note warns "Cooperate or boom and bang!" instead of stating expressly that Pruitt or the observers had a lethal weapon. See id. (providing as an example of conduct constituting a threat of death "'Give me your money or else (where the defendant draws his hand across his throat in a slashing motion)'").

In addition, a reasonable bank teller would have interpreted the "boom or bang" threat to be directed at the teller and the bank because the note advised that there were "2 sets of eyes" watching to ensure that the teller cooperated with the

8

note's demands.  At a minimum, a reasonable interpretation of the note was that both the bank teller and Pruitt's family were being threatened.

Second, in addition to the demand note, there was evidence that Pruitt verbally threatened tellers Jimenez and Diggs.  Specifically, the PSI stated that Pruitt told Diggs and Jimenez that "if they did not give him the money then 'boom, you are dead'" and "threatened several times that if [Jimenez and Diggs] did not cooperate they would die."  According to Agent Agiz's testimony at sentencing, Pruitt told Jimenez that "there are two black men inside this bank that are watching you and there is one outside and if you do not cooperate, boom," and Driggs overheard Pruitt saying this to Jimenez.  After hearing Agent Agiz's testimony and Pruitt's cross-examination, the district court found Agent Agiz's testimony regarding the threats to be credible.  It was within the province of the district court to make this credibility finding, and we will not disturb it.[3]  See United States v. Glinton, 154 F.3d 1245, 1258-59 (11th Cir. 1998) (stating that "the appellate court shall give due regard to the opportunity of the sentencing court to judge the credibility of the witnesses" (internal quotation marks and brackets omitted)).

---

[3]Furthermore, it was permissible for the district court to rely on hearsay in applying the enhancement.  See United States v. Zlatogur, 271 F.3d 1025, 1031 (11th Cir. 2001) (stating that a district court may rely on hearsay evidence at sentencing as long as the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence).

**B. Criminal History Category**

Next, Pruitt challenges the district court's calculation of his criminal history category.[4]  First, Pruitt argues that the assigned three criminal history points for the January 2008 sentence imposed upon revocation of his state probation was not a "prior sentence" under U.S.S.G. § 4A1.1(a) because it was based on conduct that was part of the instant offense.  U.S.S.G. § 4A1.1(a) instructs the district court to "[a]dd 3 points for each prior sentence of imprisonment exceeding one year and one month."  U.S.S.G. § 4A1.1(a).  The guidelines explain that "[a] sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense."  U.S.S.G. § 4A1.2 cmt. n.1.

The January 2008 state sentence was imposed after Pruitt committed the instant bank robbery in October 2007, but before he was sentenced for this bank robbery offense in January 2009.  Also, according to the PSI, the January 2008 state probation revocation and three-year sentence were based on a state probation warrant for Pruitt's arrest issued in February 2007 (which was several months before the instant bank robbery) due to Pruitt's failure to report, to pay a

---

[4]We review a district court's factual findings for clear error and its application of the guidelines de novo.  Phillips, 413 F.3d at 1292.  We review de novo a claim of double counting.  United States v. Dudley, 463 F.3d 1221, 1226 (11th Cir. 2006).

supervision fee and restitution, and to follow the advice and instructions of the state probation officer. Pruitt admitted these facts in the PSI by not challenging them in the district court. See United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006) ("It is the law of this circuit that a failure to object to allegations of fact in a PSI admits those facts for sentencing purposes."). Furthermore, Pruitt's argument that, "[b]ecause the probation revocation occurred subsequent to the [instant] offense, the likelihood that the revocation was based in large part on the instant offense is substantial" is pure speculation. Thus, Pruitt's January 2008 state sentence satisfies the definition of a "prior sentence" in U.S.S.G. § 4A1.2(a).

Second, Pruitt argues that it was impermissible double-counting for the district court to award him criminal history points for both committing the instant bank robbery offense while on state probation and for the January 2008 state sentence imposed upon revocation of that state probation. Impermissible double-counting occurs "when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." United States v. Phillips, 363 F.3d 1167, 1168 (11th Cir. 2004) (quotation marks omitted).

Here, there was no double-counting because these two sets of criminal history points were awarded for distinct reasons. Pruitt received two criminal

11

history points for committing the instant bank robbery offense while on state probation. See U.S.S.G. § 4A1.1(d) (instructing the district court to "[a]dd 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation"). Pruitt received three criminal history points for the January 2008 sentence of three years' imprisonment that was imposed upon revocation of his probation. See U.S.S.G. § 4A1.1(a). The PSI addendum, which the district court adopted, stated that: (1) the state probation revocation order indicated that Pruitt's probation was revoked based only on the technical violations listed in the February 2007 probation warrant; and (2) South Carolina probation officials confirmed that Pruitt's October 2007 bank robbery did not serve as a basis for the probation revocation. In any event, as also noted in the PSI addendum, the Supreme Court has stated that post-revocation penalties are attributable to the original conviction, not the offenses that caused the revocation. Johnson v. United States, 529 U.S. 694, 700-01, 120 S. Ct. 1795, 1800-01 (2000). Thus, the three criminal history points for his January 2008 three-year imprisonment sentence were attributable to his 2005 state fraudulent check conviction, even if the bank robbery was a basis for the revocation of Pruitt's state probation.

Finally, Pruitt argues that "the vagaries of the Court's schedule" resulted in a violation of his equal protection rights because he would not have received as

12

many criminal history points if had he been sentenced for the instant bank robbery offense before he was sentenced for violating his state probation. Because Pruitt raises this argument for the first time on appeal, we review only for plain error. United States v. Castro, 455 F.3d 1249, 1253 (11th Cir. 2006).[5] And because Pruitt cites no case law from this Court or the United States Supreme Court that supports this argument, he cannot show that any alleged error in this regard by the district court was plain. See United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).

## C.    Acceptance-of-Responsibility Reduction

Finally, Pruitt argues that the district court erred by failing to award him a one-level acceptance-of-responsibility reduction, pursuant to U.S.S.G. § 3E1.1(b).[6] "[U]pon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea guilty," the district court may

---

[5]Under plain error review, we will reverse only if there was (1) an error, (2) that was plain, (3) that affected substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Castro, 455 F.3d at 1253.

[6]We generally review a denial of an acceptance-of-responsibility reduction for clear error. United States v. Knight, 562 F.3d 1314, 1322 (11th Cir. 2009), petition for cert. filed, (June 23, 2009) (No. 08-11096). However, because Pruitt did not object to the district court's failure to award him an additional one-level reduction, we review only for plain error. See United States v. Bennett, 472 F.3d 825, 831 (11th Cir. 2006) (stating that this Court "review[s] objections to sentencing calculation issues raised for the first time on appeal for plain error").

13

award a defendant an additional one-level reduction for acceptance of responsibility under § 3E1.1(b), so long as he qualifies for the two-level reduction under § 3E1.1(a) and has an offense level of 16 or greater prior to the two-level reduction. U.S.S.G. § 3E1.1(b). The guidelines commentary specifies that "an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing." U.S.S.G. § 3E1.1 cmt. n.6. The guidelines require a motion from the government "[b]ecause the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial." Id.

Here, the government did not move for an additional one-level acceptance-of-responsibility reduction under § 3E1.1(b), and the district court thus declined to award Pruitt the reduction. Pruitt cites this Court's precedent stating that "once a defendant is awarded a two-level reduction for acceptance of responsibility, whether or not to grant the additional one-level reduction is a matter of determining only whether the defendant timely provided information and notified authorities of his intention to enter a plea of guilty." United States v. McPhee, 108 F.3d 287, 289-90 (11th Cir. 1997); see also United States v. Johnson, 132 F.3d 628, 631-32 (11th Cir. 1998) (applying McPhee). However, McPhee and Johnson were decided before § 3E1.1(b) was amended in 2003 to require that the

14

government file a motion before the additional one-level reduction can be applied. See U.S.S.G. App. C, amend. 649 (effective April 30, 2003). Thus, Pruitt's reliance on this Court's precedent interpreting the pre-amendment version of § 3E1.1(b) is unavailing.

Pruitt contends, however, that the government refused to file such a motion in retaliation for his attorney's pre-sentencing discovery requests. We have not addressed previously whether, or to what extent, we may review the government's decision not to file a § 3E1.1(b) motion. In the related context of government motions for U.S.S.G. § 5K1.1 substantial-assistance departures, we may review the government's decision not to file such a motion only for an unconstitutional motive. United States v. Nealy, 232 F.3d 825, 831 (11th Cir. 2000) (citing Wade v. United States, 504 U.S. 181, 112 S. Ct. 1840 (1992)); see also United States v. Lapsins, 570 F.3d 758, 769 (6th Cir. 2009) (applying Wade to the § 3E1.1(b) context and citing cases from other circuits doing the same). Even assuming arguendo that the review framework for a § 5K1.1 motion applies here, there is no record evidence that the type of unconstitutional motive contemplated by Wade was involved here. Rather, the government's sentencing memorandum stated that it would not file a § 3E1.1(b) motion because Pruitt denied making death threats during the bank robbery, despite his guilty plea. Pruitt's assertion that the

15

government refused to file the motion in retaliation for his requests for pre-sentencing discovery is pure speculation.

## III.  CONCLUSION

In conclusion, we affirm Pruitt's 78-month sentence on his bank robbery conviction.