**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

           v.

MICHELLE WING,
           *Defendant-Appellant.*

No. 11-30017

D.C. No.
9:01-cr-00037-
DWM-1

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
December 7, 2011—Seattle, Washington

Filed June 21, 2012

Before: M. Margaret McKeown and Richard C. Tallman,
Circuit Judges, and Barry Ted Moskowitz, District Judge.*

Opinion by Judge Moskowitz;
Dissent by Judge Tallman

---

*The Honorable Barry Ted Moskowitz, Chief Judge of the United States District Court for the Southern District of California, sitting by designation.

7335

**COUNSEL**

John Rhodes, Federal Defenders of Montana, Missoula, Montana, for the defendant-appellant.

J. Bishop Grewell, U.S. Attorney's Office, Helena, Montana, for the plaintiff-appellee.

**OPINION**

MOSKOWITZ, District Judge:

Michelle Wing appeals the district court's revocation of her second term of supervised release, which had not yet commenced, based on newly discovered violations of conditions of her previously revoked first term of supervised release. Wing contends that the district court lacked jurisdiction to

revoke her second term of supervised release. In this matter of first impression, we conclude that a district court lacks jurisdiction under 18 U.S.C. § 3583(e)(3) to revoke a term of supervised release based on newly discovered violations of a previously revoked term of supervised release. Accordingly, we REVERSE and REMAND.

I

On August 8, 2001, a grand jury in the District of Montana returned an indictment against Michelle Wing, charging her with one count of bank embezzlement in violation of 18 U.S.C. § 656. On October 18, 2001, Wing entered a plea of guilty to the charge and was thereafter sentenced to six months in prison followed by five years of supervised release.

Wing's term of supervised release commenced on February 11, 2004. On April 24, 2008, Wing's probation officer filed a petition to revoke Wing's supervised release. The petition alleged that Wing had violated the conditions of supervised release by: (1) providing her probation officer with a falsified document; (2) failing to obtain approval of her probation officer before making payments to the Washington State Employment Security Division; (3) incurring new debt with the purchase of a home and a vehicle without the advance approval of the probation officer; and (4) failing to submit timely monthly reports to her probation officer.

On June 6, 2008, the Montana district court found that Wing had committed all of the violations alleged in the petition. The district court revoked Wing's supervised release and sentenced her to 3 months of imprisonment followed by 33 months of supervised release. Wing self-reported to prison on August 29, 2008.

On November 18, 2008, a grand jury in the Eastern District of Washington returned a 22-count indictment charging Wing

with bank fraud, conspiracy, and identity theft, based on conduct that took place between June 1, 2006, and July 31, 2008.

On November 25, 2008, Wing's probation officer filed a petition with the Montana district court to revoke Wing's second term of supervised release, which was scheduled to commence the very next day, based on Wing's commission of the crimes alleged in the Eastern District of Washington case in addition to other violations (leaving the district of supervision without permission of the probation officer, failing to submit truthful and complete monthly reports, and failing to notify the probation officer of any change in employment). That same day, the Montana district court issued a warrant for Wing's arrest.

On November 26, 2008, Wing was released from prison and was immediately arrested on the district court's warrant. Before appearing for her revocation hearing in Montana, Wing was transferred to the Eastern District of Washington to face the criminal charges in that case. Wing ultimately pled guilty to a number of counts in the Eastern District of Washington case and was sentenced to 86 months of imprisonment and a five-year term of supervised release.

On November 20, 2009, Wing appeared before the Montana district court for a supervised release revocation hearing. During the hearing, Wing admitted to the violations alleged in the petition. Based on these violations of conditions of the first term of supervised release, the Montana district court revoked the second term of supervised release and imposed a sentence of 33 months of imprisonment to run consecutively to the sentence imposed in the Eastern District of Washington.[1]

---

[1]Although some of the conduct underlying the Eastern District of Washington indictment occurred after the revocation of Wing's first term of supervised release and before she self-reported to prison on August 29, 2008, the Montana district court found, "The conduct in all four violations occurred during Wing's term of supervised release that commenced in February 2004 . . . ." (Order, Jan. 18, 2011, ECF 87.)

The court did not impose an additional term of supervised release, reasoning that Wing would be under the supervised release of the sentence imposed in the Eastern District of Washington.

On November 25, 2009, Wing appealed the Montana district court's revocation of her second term of supervised release. Wing argued on appeal that the district court lacked jurisdiction to revoke her term of supervised release because the term had not yet commenced. This court remanded the case because Wing had not presented her jurisdictional argument before the district court.

On remand, the district court ordered the parties to submit briefs on the jurisdictional argument raised on appeal. In an order filed on January 18, 2011, the court held that it had jurisdiction to revoke Wing's second term of supervised release, reasoning that if it had known of the additional violations at the time it revoked Wing's first term of supervised release, the court would not have sentenced Wing to only a three-month term of imprisonment:

> In this regard, the second revocation sentence relates back to the Court's original revocation hearing and accounts for the additional violations that were significant breaches of the Court's trust, but were not known to the Court at that time. Simply put, the revocation challenged here pertained to the first term of supervised release.

Relying on language in *Johnson v. United States*, 529 U.S. 694, 704 (2000), the district court reasoned that the first term of supervised release "retain[ed] vitality" and "continued to have some effect" even though it had been revoked. Therefore, the court held that it had jurisdiction to "adjust[ ] Wing's first revocation sentence by imposing a subsequent sentence that considered the full scope of her breaches of trust, as well as the need to protect the public from further crimes by her."

## II

We review de novo whether a district court has jurisdiction to revoke a term of supervised release. *United States v. Ignacio Juarez*, 601 F.3d 885, 888 (9th Cir. 2010).

## III

The issue before us is whether, under 18 U.S.C. § 3583, a district court has jurisdiction to revoke a future term of supervised release based upon newly discovered violations of conditions of a past term of supervised release. We have not located any reported decisions addressing this issue under the current version of the statute. As in all statutory interpretation cases, we look first to the language of the statute. We have examined the statutory scheme governing supervised release as well as the sentencing scheme for violations of supervised release, and conclude that the district court lacked jurisdiction to revoke Wing's second term of supervised release.

### A.   *Statutory Structure: 18 U.S.C. § 3583*

In 18 U.S.C. § 3583, Congress has established a scheme where separate and distinct terms of supervised release may be imposed upon a repeat offender of supervised release conditions. Each term has its own conditions as well as its own beginning and end (either by termination or revocation). This statutory scheme leads us to conclude that once a term of supervised release has been revoked, a later-discovered violation of a condition of that term cannot form the basis of a revocation of a subsequent term of supervised release.

A district court's authority to impose, modify, terminate, or revoke supervised release derives from § 3583. Subsections 3583 (a)-(d) bestow upon district courts the power to impose supervised release, outline the factors to be considered when doing so, limit the length of terms of supervised release, and list the conditions of release that a court may order. Subsec-

tions (e) and (g)-(i) govern the modification, termination, and revocation of supervised release as well as the sanctions courts may impose upon revocation.

Our focus is on subsection (e), which gives a district court authority to modify, terminate, or revoke supervised release. Under subsection (e), a court may, after considering enumerated factors set forth in § 3553(a): (1) terminate a term of supervised release and discharge the defendant at any time after the expiration of one year of supervised release (§ 3583(e)(1)); (2) extend a term of supervised release (if less than the maximum authorized term was previously imposed) and may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release (§ 3583(e)(2)); or (3) revoke a term of supervised release. (§ 3583(e)(3)).

In 2000, when Wing committed her crimes of conviction, subsection (e)(3) provided in relevant part that the district court may:

> revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense

is a class C or D felony, or more than one year in any other case . . . .

18 U.S.C. § 3583(e)(3) (2000).[2]

When revoking supervised release and imposing a term of imprisonment, the court may include a requirement that the defendant be placed on another term of supervised release after imprisonment. 18 U.S.C. § 3583(h). In 2000, subsection (h) provided:

> When a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized under subsection (e)(3), the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release.[3]

---

[2]In 2003, subsection (e)(3) was amended by the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. 108-21, § 101, 117 Stat. 650, 651. Prior to the 2003 amendments made to § 3583(e)(3) by the PROTECT Act, when calculating the maximum term of imprisonment that could be imposed upon revocation of supervised release, courts would subtract the aggregate length of prior imprisonment terms imposed upon revocation of supervised release from the statutory maximum. *See United States v. Jackson*, 329 F.3d 406, 407-08 (5th Cir. 2003). The PROTECT Act amended subsection (e)(3) to make it clear that the statutory maximum term of imprisonment applies "on any such revocation," meaning that the statutory maximum term of imprisonment can be imposed for any one of multiple revocations of supervised release. *See United States v. Knight*, 580 F.3d 933, 935-37 (9th Cir. 2009).

[3]Under this version of § 3583(h), a subsequent term of supervised release could be imposed only when the defendant was required to serve

Finally, § 3583(i) specifies under what circumstances a court may revoke a term of supervised release after the expiration of that term:

> The power of the court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment and . . . a further term of supervised release, extends beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation.

## B. *Statutory Analysis: 18 U.S.C. § 3583(e)(3)*

Wing argues that the district court lacked the jurisdiction to revoke her future term of supervised release for violations she committed during a past term of supervised release. The government, in contrast, contends that § 3583(e)(3) authorized the district court to revoke Wing's second term of supervised release based on the newly discovered violations of conditions of her first term of supervised release.

In arguing that the district court had jurisdiction to revoke Wing's second term of supervised release under 18 U.S.C. § 3583(e)(3), the government takes two extreme and contradictory positions regarding the relationship between Wing's

---

a term of imprisonment that was "less than the maximum term of imprisonment authorized under subsection (e)(3)." The PROTECT Act amended subsection (h) by eliminating this language from the statute. However, both before and after the 2003 amendments, under subsection (h), the *length* of a term of supervised release imposed following revocation cannot exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less the aggregate of all terms of imprisonment imposed upon revocations of supervised release. *Knight*, 580 F.3d at 940.

first and second terms of supervised release. First, the government agrees with Wing that her second term of supervised release was separate from her first term of supervised release, but argues that under the statute, a term of supervised release may be revoked based on the violation of a wholly separate term of supervised release. Next, the government claims that Wing's second term of supervised release and first term of supervised release were one and the same. According to the government's latter position, with which the district court agreed, Wing's second term of release was actually a continuation of her first term, and therefore the district court could revoke the second phase of supervised release after discovering violations that took place in an earlier phase of the same term of release. Neither of the government's positions is persuasive or compelling under the statutory language.

Under the first of the government's alternative readings of subsection (e)(3), the district court was permitted to "revoke a term of supervised release" (the not-yet-commenced second term of supervised release) because the district court found by a preponderance of the evidence "that the defendant violated a condition of supervised release" (a condition of the first term of supervised release). In other words, the government interprets subsection (e)(3) as allowing revocation of supervised release based upon a violation of a condition of *any* term of supervised release, not necessarily the term of supervised release that is being revoked.

The government argues that Congress could have specified that a court can revoke a term of supervised release when the defendant violated a condition of "the term of supervised release." Instead, Congress varied its phrasing and authorized revocation upon violation of "a condition of supervised release." The government contends that this broader language grants the district court authority to revoke a term of supervised release based solely on a finding that "the defendant violated a condition of supervised release," no matter which term of supervised release.

We acknowledge that the relevant clause in subsection (e)(3), read in isolation, is ambiguous. The clause does not specify which term of supervised release the defendant must have violated. It does not expressly require that the violated condition relate to the term of supervised release that is being revoked, nor does it expressly permit revocation of future terms of supervised release based on violations of conditions of previously revoked terms of supervised release. Although, as pointed out by the government, the language does not specify that the condition violated must be of "the term of supervised release [being revoked]" or "such term of supervised release," the language also does not provide that the condition violated may be of "*any* term of supervised release."

To determine whether "a condition of supervised release" refers to a condition of any term of supervised release, or a condition of the specific term of supervised release that is being revoked, we look to the statutory framework. When interpreting words in a statute, "we start with the premise that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *American Bankers Ass'n v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Our goal is to "understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a . . . harmonious whole.' " *Id.* (quoting *Brown & Williamson*, 529 U.S. at 133).

**[1]** Section 3583 establishes a scheme under which distinct *terms* of supervised release may be imposed. If a district court revokes a term of supervised release under § 3583(e)(3) and sentences the defendant to a term of imprisonment, the court may again impose "a term of supervised release after imprisonment." 18 U.S.C. § 3583(h). If the new term of supervised release is later revoked due to violations of conditions, subject to certain limitations, the district court may again impose a term of imprisonment and yet another term of supervised

release. Congress could have chosen to have a continuing period of supervised release that recommences after terms of imprisonment.[4] Instead, Congress created a structure of separate terms of supervised release, which guides our analysis of the statute.

[2] Under the ordinary meaning of "revoke," when a term of supervised release is revoked, the term is canceled, and any new term of supervised release that has been imposed is in effect. The conventional definition of "revoke" is "to void or annul by recalling, withdrawing, or reversing." American Heritage Dictionary 1493 (4th ed. 2000). *See also* Webster's Third New International Dictionary 1944 (1981) ("to annul by recalling or taking back"). Thus, when a term of supervised release is revoked, it has been annulled, and the conditions of that term do not remain in effect. Accordingly, a term of supervised release cannot be revoked based on a violation of a condition of a previously revoked term of supervised release, and subsection (e)(3) necessarily refers to a violation of the term of supervised release that is being revoked.

[3] In *Johnson*, the Supreme Court applied an "unconventional" definition of "revoke" to subsection (e)(3). 529 U.S. at 706-07. Under this "less common" definition, revoke can mean to recall without final abrogation, meaning that a "revoked" term can "retain vitality after revocation." *Id.* at 707, n.9. However, as we discuss below, the Supreme Court's application of the "unconventional" definition of "revoke"

---

[4]Prior to the addition of subsection (h) in 1994 by the Violent Crime Control and Law Enforcement Act of 1994, § 110505(2)(B), 108 Stat. 2017, the United States Sentencing Commission's *Guidelines Manual* referred to the possibility that a defendant could be ordered to "recommence" supervision upon release from imprisonment. *See* U.S.S.G. § 7B1.3(g)(2), p.s. (Nov.1993). In subsection (h), Congress made it clear that a new term of supervised release commences after the term of imprisonment. Effective November 1, 1995, Amendment 533 revised the language of § 7B1.3(g)(2) to eliminate references to "recommencement" of supervised release.

was based on the language of subsection (e)(3) before the 1994 amendments. The Court's reasoning for adopting an "unconventional" definition of "revoke" does not apply to the amended statutory language, and there is no reason to believe that Congress used the term "revoke" in anything other than its ordinary sense.

The government's interpretation is so broad that it logically would permit revoking a term of supervised release based on a violation of a condition of a prior term of supervised release that relates to a different offense. (In this case, the terms of supervised release stemmed from the same original offense.) Thus, under the government's reading, it is possible that the following scenario could take place: (1) Defendant is convicted of Offense A and is sentenced to a term of supervised release, which ends; (2) Defendant is then convicted of offense B, a more serious felony than Offense A, and is sentenced to a term of supervised release; (3) During the second term of supervised release, the court is made aware of a violation of a condition of the first term of supervised release; and (4) The court revokes the second term of supervised release based on the violation of the condition of the first term of supervised release, and sentences the defendant to a term of imprisonment and a new term of supervised release. The problem with this scenario is that it does not fit into the statutory scheme for determining the maximum term of imprisonment upon revocation and the maximum length of a term of supervised release upon revocation.

Under subsection (e)(3), upon revocation, a defendant may not be required to serve on such revocation, "more than 5 years in prison if *the offense that resulted in the term of supervised release* is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case." (Emphasis added.) Under subsection (h), the length of a term of supervised release imposed upon revocation shall not exceed "the term of supervised release *autho-*

*rized by statute for the offense that resulted in the original term of supervised release*, less any term of imprisonment that was imposed upon revocation of supervised release." (Emphasis added.) Under the scenario set forth above, it would be unclear whether the maximum term of imprisonment and maximum length of supervised release would be governed by Offense A or the more serious Offense B. The government's reading requires permitting a scenario that Congress clearly did not envision—the revocation of a supervised release term based on the violation of a condition of a term of supervised release that resulted from a different original offense.

**[4]** Our reading of subsection (e)(3) is buttressed by the 2003 amendment of the statute.[5] The PROTECT Act amended subsection (e)(3) to provide:

> [A] defendant whose term is revoked under this paragraph may not be required to serve *on any such revocation* more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case.

(Emphasis added). Under the government's interpretation of (e)(3) as it now stands, a defendant could receive multiple maximum terms of imprisonment based upon violations of the same term of supervised release. It is doubtful that Congress intended such a result.

Furthermore, the government's interpretation is undermined by § 3583(i). Under this subsection, a district court has

---

[5]Although the amended version of subsection (e)(3) would not apply to Wing because her crimes of conviction occurred in 2000, the amendment sheds light on the interplay between terms of supervised release and terms of imprisonment imposed upon revocation.

power to revoke a term of supervised release "beyond the expiration of the term of supervised release" only where a warrant or summons based on an allegation of a violation of a condition of supervised release has been issued before the expiration of the term of supervised release.[6] It would make little sense for Congress to restrict the circumstances under which a district court can revoke an expired term of supervised release if courts have the authority to punish any belatedly discovered supervised release violation, however ancient, by revoking terms of supervised release that are ongoing or have yet to begin.

After urging that under subsection (e)(3), a present or future term of supervised release can be revoked for violations of a separate, previously revoked term of supervised release, the government precipitously tacks in the opposite direction and argues that under subsection (e)(3), both of Wing's terms of supervised release were one and the same— that is, the later term was simply a continuation of the former term. Following this same rationale, the *district court relied on Johnson*, and held that it had jurisdiction to revoke Wing's second term of supervised release based on violations of the first term of supervised release, because the first term of supervised release "continued to have some effect and vitality."

In *Johnson*, the Supreme Court held that under § 3583(e)(3), as it was written before the 1994 amendments, the word "revoked" was used in an "unconventional sense"

---

[6]Although Wing's term of release arguably did not "expire" but was, rather, revoked, the government's argument that a defendant may be punished for violations during past terms of supervised release extends to all past terms of release, whether they expired or were revoked. Further, we think it anomalous that Congress would give the government an unlimited amount of time to discover and punish a defendant for serious supervised release violations that occurred during a revoked term, but provide no leeway as to the timing for seeking punishment against defendants who committed equally, or more, serious violations during terms that expired.

that allowed a "revoked" term of supervised release to "retain vitality after revocation" and permitted any balance of the revoked term not served in prison to be served out as supervised release. 529 U.S. at 706-707. Prior to the 1994 amendments, subsection (e)(3) provided that a district court could "revoke a term of supervised release, and require the person to *serve in prison all or part of the term of supervised release* . . . ." *Id.* (emphasis added). Based on this language, the Supreme Court reasoned that because all or part of "the term of supervised release," not a "term of imprisonment," is being served in prison, then "something about the term of supervised release survives the preceding order of revocation." *Id.* at 705. Accordingly, the remaining balance of the term of supervised release may be served out as supervised release when the reincarceration is over, effectively as a continuation of the first term of supervised release. *Id.* at 706-07.

**[5]** Guidance from both the Supreme Court and Congress indicates that the "unconventional" sense of revoke is now obsolete in light of the 1994 amendments. The 1994 amendments added subsection (h), which provides that a prisoner serves a post-revocation "term of imprisonment" rather than all or part of a term of supervised release. The 1994 amendments also replaced subsection (e)(3)'s language, "all or part of the term of supervised release," with "all or part of the term of supervised release *authorized by statute for the offense that resulted in such term of supervised release*." (Emphasis added.) The amendments made it clear that a defendant sentenced to prison upon revocation of supervised release is not serving a portion of the *original term of supervised release*, but, rather is serving a "*term of imprisonment*," the length of which is all or part of the term of supervised release authorized by statute for the original offense.[7] Under the amended

---

[7]Before 1994, the cumulative length of the period of imprisonment upon revocation and subsequent period of supervised release was limited by the length of the original period of supervised release actually imposed by the court. Consistent with the reasoning of *Johnson*, because the periods of imprisonment and subsequent supervised release were a continuation of the original term of release that was imposed, they were necessarily subject to the same limitation in length. *See United States v. Anderson*, 519 F.3d 1021, 1025 (9th Cir. 2008).

language, a term of supervised release after imprisonment is not the balance or remainder of the original term of supervised release, but, rather, is a new and separate term.

In *Johnson*, the Supreme Court itself recognized that the statutory language upon which it was relying was changed by the 1994 amendments: "As it was written before the 1994 amendments, subsection (3) did not provide (as it now does) that the court could revoke the release term and require service of a prison term equal to the maximum authorized length of a term of supervised release." *Id.* at 705. The Supreme Court's analysis of the word "revoked" was based on its reading of subsection (e)(3) "before its amendment and the addition of subsection (h)." *Id.* at 713. In particular, the Court explained that under the pre-amendment language, which permitted the court to require the defendant to "serve in prison all or part of the term of supervised release," it is not a " 'term of imprisonment' that is to be served but all or part of 'the term of supervised release.' " *Id.* at 705. This reasoning no longer holds true given the use of the "term of imprisonment" in subsection (h). *See also United States v. Xinidakis*, 598 F.3d 1213, 1217 n.5 (9th Cir. 2010) (discussing the limited reach of *Johnson* and pointing out the differences between the pre-amendment and post-amendment language of subsection (e)(3)).

Finally, subsection (h), by its own terms, distinguishes between terms of release rather than periods or phases of the same term of release. The dissent correctly notes that neither the Court nor Congress uses the term "first" and "second" term of supervised release. Dissent at 7363-64. Whatever "nomenclature" is best, *id.*, the fact remains that subsection (h), added in 1994, clearly distinguishes between the "term of supervised release after imprisonment" and the "original term of supervised release."

[6] Contrary to the position taken by Judge Tallman in his dissent, the Supreme Court's reasoning cannot be extended to

§ 3583 as it exists after 1994, and does not support the proposition that once a term of supervised release is revoked, it continues to have some effect, permitting the district judge to sentence the defendant to additional terms of imprisonment based on violations discovered after revocation.

C.   *Sentencing Scheme for Supervised Release Violations*

**[7]** Our interpretation of § 3583(e)(3) finds further support in the sentencing scheme for violations of supervised release set forth in the *Guidelines Manual*. Under this scheme, separate terms of imprisonment are imposed for violations of separate *terms* of supervised release, not separate *violations* of the same term.

Under U.S.S.G. § 7B1.1, supervised release violations are separated into three grades—Grade A, Grade B, and Grade C violations. Section 7B1.4 sets forth guideline ranges of imprisonment based on the grade of the violation and the defendant's Criminal History Category.

When there are multiple violations of the conditions of a term of supervised release, "the grade of the violation is determined by the violation having the most serious grade." § 7B1.1(b). Thus, violations of conditions of a term of supervised release are not individually punished. The court considers all of the violations pertaining to the term of supervised release before it and determines the term of imprisonment based upon the most serious violation.

The *Guidelines Manual* does not provide for the continued ability to impose terms of imprisonment for violations of conditions of a previously revoked term of supervised release. If district courts were permitted to revoke a subsequent term or terms of supervised release based upon newly discovered violations of a prior term of supervised release, there would be uncertainty regarding the circumstances under which imprisonment could be imposed and the length of such imprison-

ment. For example, would the district court only be allowed to revoke the subsequent term if the newly discovered violations were more serious than the previously known violations? In calculating the appropriate term of imprisonment for the newly discovered violations, would the length of previously imposed terms of imprisonment for violations of the same term of supervised release have to be subtracted? Adopting the dissent's reading would therefore give rise to inconsistency and confusion, not just within the statutory scheme, but also within the sentencing scheme under the Guidelines.

D.  *Public Policy*

Ordinarily, an analysis of the relevant statute and controlling case law would conclude our discussion. The government and dissent, however, see fit to go far beyond the statutory text to public policy considerations that purportedly support their claim that the revocation of Wing's second supervised release was appropriate. *See* Dissent at 7364, 7365-69.

The government argues that public policy supports its position because if courts lacked the authority to punish subsequently discovered violations of previously revoked terms of supervised release, devious defendants would have the incentive to insulate serious violations from penalty by quickly committing and coming forward with a less severe violation, and obtaining a revocation of supervised release based on the less serious violation. Although the scenario the government presents is theoretically possible, we are not convinced that defendants who have committed serious vioations will risk drawing attention to themselves for the purpose of manipulating supervised release revocation proceedings. The government's concern is clearly more theoretical than realistic, and, more importantly, does not address the statutory scheme.

The dissent in turn raises concerns about defendants squeezing out "crocodile tears" to convince judges to release

them in between terms of supervised release—a period of time the dissent terms the "Twilight Zone"—so they may commit crimes without consequences. Dissent at 7364, 7370.[8] At the outset, we note that the extremely unlikely scenario that the dissent finds so fearsome appears not to have disturbed Congress. If Congress wishes to expand the ability of district court judges to prevent or deter further criminal activity between periods of supervised release, Congress may enact legislation doing so.

Under the statutory scheme Congress has chosen, once a term of supervised release is revoked, that term ends, and any term of supervised release commencing after imprisonment for violation of the first term of supervised is a new and separate term. That Congress has made such a policy choice should be enough for any court. However, we will address the dissent's arguments to dispel its concerns.

Initially, we note that in this case, Wing's second term of supervised release was revoked for violations occurring during the first term of supervised release, not for crimes committed during the time between the two terms of supervised release. Although the Indictment filed in the Eastern District of Washington covered conduct between June 1, 2006 and

---

[8]In his dissent, Judge Tallman envisions an ominous "Twilight Zone" episode in which a defendant, who is serving three months on a revocation of supervised release strangles two inmates and leaves another in a coma. Judge Tallman expresses disbelief that a district court cannot revoke the defendant's upcoming period of supervised release based on her conduct. However, under 18 U.S.C. § 3624(e), "A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days." Thus, even setting aside the argument that revocation ends a term of supervised release, it is clear that the hypothetical defendant was not on supervised release at the time that she committed her violent acts in prison and thus could not be punished for violating a condition of supervised release. Of course, if there was actual proof that she committed the homicides, she would be prosecuted for murder.

July 31, 2008, the Montana district court did not make any findings that Wing had committed crimes after the revocation date of June 10, 2008. Instead, the district judge specified, "The conduct in all four violations occurred during Wing's term of supervised release that commenced in February 2004 . . . ."

Although Judge Tallman's concern regarding "twilight zones" is understandable, district courts are not without means to ensure that defendants do not use the gap between periods of supervised release to go on crime sprees. First of all, a district court judge does not have to allow a defendant whose supervised release has been revoked and has been sentenced to prison to be released on bail so she can self-surrender. Under 18 U.S.C. § 3143, a defendant should not be released pending execution of a sentence unless the judge finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)." In practice, defendants who are sentenced to prison for supervised release violations are not likely to be given the opportunity to self-surrender, especially in cases such as this one where the defendant is allegedly continuing to engage in the same type of criminal behavior (financial dishonesty) for which she was originally convicted.

Further, in cases where a district court chooses to release the defendant on her personal recognizance or upon execution of an unsecured appearance bond, the release is subject to the condition that the person not commit a federal, state, or local crime during the period of release. 18 U.S.C. § 3142(b). If the court believes additional conditions of release are necessary, the court may impose such conditions under 18 U.S.C. § 3142(c).

If a defendant commits a crime while on release, the defendant shall be sentenced, in addition to the sentence prescribed for the offense, to (1) a term of imprisonment of not more

than ten years if the offense is a felony; or (2) a term of imprisonment of not more than one year if the offense is a misdemeanor. 18 U.S.C. § 3147. Additionally, under the Sentencing Guidelines, courts are instructed to apply a three-level sentencing enhancement for a commission of an offense while on release. U.S.S.G. § 3C1.3. Further, a person who violates a condition of his or her release is subject to a criminal prosecution for contempt under 18 U.S.C. § 401; 18 U.S.C. § 3148(a).

Thus, district courts have tools to safeguard against the release of defendants who may pose a danger to the public. The district courts also have the power to penalize defendants who abuse the court's trust during release.

One further benefit of our interpretation of § 3583(e)(3) is that it promotes finality and the avoidance of piecemeal appeals. Under the government's interpretation, a defendant's sentence for violating conditions of a term of supervised release would be uncertain and subject to change as long as the defendant had time remaining on supervised release. The dissent's conclusory assertion that our concern regarding finality is "hollow" and subordinate to the menace that is the "Twilight Zone" is unsupported by anything other than the dissent's own policy balancing.

Ultimately, the dissent gives insufficient credit to the nuanced purposes the statute embodies. The statute is meant to curb recidivism to be sure, but not at the cost of subjecting defendants to an ongoing risk of punishment for violations of some prior period of supervised release, however remote, and creating confusion in sentencing for supervised release violations. There are policy considerations on both sides of the question. We decline—indeed we lack the authority—to disturb the careful balance Congress has created.

E. *Rule of Lenity*

**[8]** Even if we were to conclude that after considering the text, structure, history, and purpose of the statute, there

remains a "grievous ambiguity or uncertainty" regarding the legal question before us, we would apply the "rule of lenity." *Gollehon v. Mahoney*, 626 F.3d 1019, 1027 (9th Cir. 2010). The rule of lenity applies to the Sentencing Guidelines as well as to penal statutes and provides that ambiguities concerning the ambit of criminal statutes should be resolved in favor of lenity to the defendant. *United States v. Funetes-Barahona*, 111 F.3d 651, 653 (9th Cir. 1997). Application of the rule of lenity in this case would result in the same interpretation of § 3583(e)(3) as we adopt above.

IV

[9] We conclude that the district court did not have jurisdiction under § 3583(e)(3) to revoke Wing's second term of supervised release based on newly discovered violations of conditions of her revoked term of supervised release.[9] For the reasons discussed above, we interpret subsection (e)(3) as requiring that the court find by a preponderance of the evidence that the defendant violated a condition of the term of supervised release that is being revoked.

Accordingly, we REVERSE and REMAND to the district court to vacate the sentence and judgment imposed on November 20, 2009.

---

[9]To the extent the revocation of Wing's second term of supervised release can be characterized as a "modification" of the first revocation sentence, the district court lacked jurisdiction to modify the sentence. The district court imposed the additional prison time well after the 14-day period for corrections permitted under Fed. R. Crim. P. 35(a). Significantly, none of the grounds for modification set forth in 18 U.S.C. § 3582(c) apply.

TALLMAN, Circuit Judge, dissenting:

There is now a fifth dimension beyond that previously known to federal district judges. It is a new dimension of consequence-free criminality: a dimension of unpunished corruption, unsanctioned wickedness, and unchastened immorality. It is an area between a convict's "first" term of supervised release, and her "second" term of supervised release.

Our story begins in a courtroom. The camera zooms in on the defendant's table, where a young woman wipes away her tears. The somnolent voice of the narrator, Rod Serling, intones:

> Imagine it is June 6, 2008. The location, Missoula, Montana. This is Michelle Wing, a convicted felon who's in trouble once again. She's been lying to her probation officer. Routine lies the judge will punish in a routine manner: by revoking supervised release and sending her back to jail for a few short months.

> What the judge doesn't realize, however, is that his act is not merely one of revocation, but of liberation.

> Wing will now begin an iniquitous journey through space and time. Her companion on this journey will be fraud. Her route, embezzlement. That's a signpost up ahead; her next stop: The Twilight Zone.

As the narration fades and Wing leaves the courtroom, the camera follows her. Mystified by her good fortune but happy to exploit it, Wing takes full advantage of the benevolent parameters of this unique parallel dimension. In the three weeks between July 3 and July 23, 2008, alone, she executes eight fraudulent financial transactions totaling $240,000. She spends $600 on toys at Toys "R" Us. She pays a $900 dental

bill with a forged check. And, for good measure, she outfits her many fraudulently purchased cars with fraudulently purchased wheels and tires.

The camera soon returns to the courtroom, where Wing's parole officer is seen pleading with the Montana district judge. The officer tells of Wing's two-month crime spree. He asks the judge to revoke her supervised release. But the judge —who had thought Wing was still under his supervision—can only stand by helplessly. He cannot punish crimes executed outside his rational world of crime and punishment. He has no jurisdiction over . . . The Twilight Zone.

This story might have been fanciful until today's opinion. But it is now all too real. The majority doesn't just declare separate and distinct terms of sequential supervised release. It creates gaps between those terms. And for villains like Wing, those gaps present a metaphysical nether-world constrained only by the outer limits of criminal imagination. As this outcome is equal parts science fiction and legal fiction, I must respectfully dissent.

I

Admittedly, this case is a very difficult one. Although continuing misconduct by convicted felons, particularly embezzlers, is common in our penal experience, we are the first court to apply 18 U.S.C. § 3583(e)(3) to such a unique set of facts. As the majority recognizes, the plain language of the statute itself does not give a clear answer, and we must look elsewhere to discern congressional meaning.

Luckily, however, we are not the first court to interpret § 3583(e)(3). We should follow the reasoning of the United States Supreme Court, whose prior interpretation of this statute demonstrates that supervised release is not broken into terms and Twilight Zones. By rejecting the Court's reasoning, the majority reaches a result I cannot join.

## A

*Johnson v. United States*, 529 U.S. 694 (2000), closely reviewed the language of § 3583(e)(3) to determine the scope of a district court's authority to impose supervised release. The issue in *Johnson* was whether the statute authorized a district court to (1) revoke a defendant's term of supervised release; (2) require the defendant to serve part of that term in prison; and (3) impose an additional period of supervised release following the period of revocation-based imprisonment. Although the issues in *Johnson* are slightly different from those raised here, both cases depend upon the effect of a revocation-based period of imprisonment on the preceding and succeeding periods of non-incarcerated supervised release time.

In *Johnson*, the Court focused on the revocation-based period of imprisonment in relation to the overall "term" of supervised release. The Court noted that § 3583(e)(3) allows a district court to " 'revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release . . . .' " *Johnson*, 529 U.S. at 705 (quoting § 3583(e)(3)). Based on this language, the Court reasoned that the period of imprisonment resulting from revocation "is not a 'term of imprisonment' that is to be served, but *all or part of* 'the term of supervised release.' " *Id.* (quoting § 3583(e)(3)) (emphasis added). With this holistic understanding of a term of continuing supervised release—one that encompasses the temporary period of revocation-based imprisonment—the Court recognized that even a "revoked" term of supervised release "retain[s] vitality after revocation." *Id.* at 707. Thus, the Court held that "any balance [of supervised release] not served in prison" can be served as supervised release after the temporary period of imprisonment. *Id.*

The majority bifurcates the analysis by dividing supervised release into separate and distinct "first" and "second" terms. Employing this nomenclature, the majority accepts that

Wing's "second" term of supervised release did not begin until November 26, 2008, when she was released from the temporary period of imprisonment resulting from her June 2008 revocation. The majority insists that the district court could not revoke Wing's "second" term of supervised release on November 25, 2008—the day before she was released from prison—because a court cannot revoke supervised release before the supervised release begins. *See* 18 U.S.C. § 3624(e) (explaining that supervised release "commences on the day the person is released from imprisonment . . .").

To reach this result, the majority opinion presupposes that the period from February 2004, when Wing was originally released from prison, through August 2008, when she self-reported back to prison following revocation, was her "first term" of supervised release. This "first term" of supervised release ended, says the majority, when the district court revoked it in June 2008, but permitted Wing to remain free from custody until the Bureau of Prisons designated a facility and a date of surrender. Likewise, Wing's "second term" of supervised release was set to begin on November 26, 2008, when she was released from the revocation-based period of imprisonment. There are two glaring problems with this analysis.

First, under *Johnson*, a period of imprisonment resulting from a revocation of supervised release does not divide supervised release into "first" and "second" terms unrelated to one another. The statute itself does not mention "first" or "second" terms; it simply refers to a "term of supervised release," all or part of which the court may require to be served in prison. *Johnson* recognized this, and did not define the period of supervised release that follows revocation-based imprisonment as a "second term" of supervised release. Rather, the Court recognized the post-imprisonment period as "the balance of" a single, continuing term of supervised release, of which imprisonment was but one part. *Johnson*, 529 U.S. at

705. Call it what you want—perhaps "intensive supervision in close custody"—but it is still supervised release.

Second, as stated above, the majority's division of supervised release into separate and distinct terms creates gaps in the court's supervision. In this particular case, we manage to rob the district court in Montana of the power to punish Wing for crimes she committed between the revocation of her "first" term of supervised release in June 2008 and the beginning of her "second" term of supervised release commencing in November 2008. This Twilight Zone—wherein Wing enjoyed the crime spree of her dreams—is not convincingly explained anywhere in the majority's opinion, the statute in question, or any other case.[1] Luckily for the citizens of Spokane and Missoula, Wing will still be held to account for the underlying crimes in her 2008 summer of fun: she pleaded guilty in the Eastern District of Washington to embezzlement activities that included her July transactions. If circumstances had been slightly different, perhaps through any number of technical legal errors that could have torpedoed her subsequent criminal prosecution, Wing could have walked out of prison on November 26, 2008, and gone right back to her old profession: destroying livelihoods and reputations through heartless financial crimes.

Based on a more faithful adherence to *Johnson* and the reasonable inference that Congress did not intend to create gaps in supervised release, we should soundly reject Wing's semantic effort to divide supervised release into separate terms.

---

[1]The majority suggests the problem can be avoided by not admitting the convict to release on his or her own recognizance. But the Bail Reform Act does not contemplate that all persons be incarcerated on conviction and Wing took full advantage of the district court's misplaced trust in her fidelity to abide the conditions of her O.R. release. It is no answer to say that in hindsight, she should obviously have been remanded to custody in June 2008.

The majority strays from the Supreme Court's treatment of § 3583(e)(3), despite the fact that *Johnson* is the only relevant decision interpreting this important subsection. The majority points out that Congress had already answered the question presented in *Johnson* by enacting § 3583(h), allowing district courts to impose additional periods of supervised release, and had also altered other language in the subsection. Based on this congressional action and a prior Ninth Circuit case interpreting a wholly different statutory section, *see United States v. Xinidakis*, 598 F.3d 1213 (9th Cir. 2010), the majority holds that the district court's reliance on *Johnson* was misplaced.

I concede, as did the Court in *Johnson*, that treating supervised release—including a period following revocation—as one, single term may sound "unconventional." *Johnson*, 529 U.S. at 705. But Congress has never acted to correct this reading of § 3583(e)(3). Since the Court's decision in *Johnson*, Congress has amended § 3583 seven different times without altering any of the relevant terms interpreted in that case.[2] Although this is not dispositive evidence that *Johnson* (which has never been overruled) still controls here, it is at least some indication of Congress's "endorsement of the judicial decision[ ]" in *Johnson* and its continuing vitality. *United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) ("In construing statutes, we presume Congress legislated with awareness of relevant judicial decisions."). We should therefore adhere to the Court's reasoning in *Johnson* in affirming the district court action in this case.

---

[2]*See* Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 14, 122 Stat. 4291 (2008); Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 2250, 120 Stat. 587 (2006); USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 212, 120 Stat. 192 (2006); PROTECT Act, Pub. L. No. 108-21, § 101, 117 Stat. 650 (2003); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 2102, 116 Stat. 1758 (2002); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 812, 115 Stat. 272 (2001); DNA Analysis and Backlog Elimination Act of 2000, Pub. L. No. 106-546, § 7, 114 Stat. 2726 (2000).

### B

Recognizing the district court's uninterrupted authority over Wing would also be consistent with the purposes of supervised release. We are concerned with curbing recidivism and promoting re-entry into the community. Supervised release "is a unique method of post-confinement supervision invented by the Congress for a series of sentencing reforms" included in the Sentencing Reform Act of 1984. *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991). By creating supervised release, Congress sought to give district courts broad authority to "protect the public and 'to facilitate the reintegration of the defendant into the community.' " *See United States v. Vallejo*, 69 F.3d 992, 994 (quoting U.S. Sentencing Guidelines Manual § 5D1.1 comment n.2 (1995)). A critical part of this authority is a district court's ability to revoke supervised release and require the defendant to serve all or part of the period of supervised release in prison. 18 U.S.C. § 3583(e)(3).

Congress has expressly authorized district courts to consider eight factors when revoking a defendant's supervised release. *See* § 3583(e)(3) (authorizing courts to consider the sentencing factors listed in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)). Importantly for this case these factors include "the history and characteristics of the defendant," § 3553(a)(1), as well as the need to "afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), and "protect the public from further crimes of the defendant." § 3553(a)(2)(C). In addition, we have recognized that a district court "may appropriately sanction a violator for his 'breach of trust' " when revoking supervised release. *United States v. Miqbel*, 444 F.3d 1173, 1182 (9th Cir. 2006).

The district court properly considered these factors in revoking Wing's supervised release. Given Wing's "pathological" need to embezzle funds from employers, a substantial

term of imprisonment was necessary to deter her criminal conduct and protect future victims.[3] The Montana district court recognized that Wing's $700,000 embezzlement scheme in Spokane would never have happened but for the lenient sentence she received for her first embezzlement conviction.

Most importantly, the district court properly considered Wing's egregious breach of the court's trust. When Wing appeared before the court at her June 2008 revocation hearing, she feigned great remorse in tearfully admitting the minor violations charged in her first revocation petition. She then gave an emotional promise to the court and her probation officer, pledging "to give my 100 percent on everything" in the future. Finally, she asked the court for leniency for her children's sake, testifying that she had "done everything I could do to stay out of trouble. I've met my obligations." We now know this was all false. As the court recognized later, Wing "stood right here and boldface lied to me in an emotional display . . . while she was in the middle of ripping these people off and stealing nearly a million dollars." Telling such "boldface lies" to a district court judge while shedding crocodile tears certainly constitutes the kind of "breach of trust" that may be considered when determining an appropriate period of imprisonment.[4]

Punishing such breaches of trust also appropriately deters defendants from admitting minor violations at a revocation hearing in the hope that serious, concealed violations will escape notice and punishment. The majority correctly recognizes that Wing would never have come forward on her own

---

[3]In particular, the court considered the importance of protecting victims like Wing's Spokane-based employer, a victim whose small business was bankrupted and whose personal credit was destroyed while Wing enjoyed great seats at the Super Bowl.

[4]District Judge Donald Molloy described Wing's false testimony during her June 2008 revocation hearing as "the most egregious breach of trust that I think I have encountered in nearly 14 years on the bench.".

with the minor violations charged in the June 2008 revocation petition. *Once charged*, however, Wing had a huge incentive to conceal her past crimes and lie to the district court. Wing's lies bought her more time to commit another quarter-of-a-million dollars' worth of financial crimes. If Wing had somehow escaped conviction for these crimes in Eastern Washington, her criminal conduct would go completely unsanctioned. Thus, denying jurisdiction in this case *would* incentivize defendants to conceal crimes at a revocation hearing.

## C

Finally, Wing objects to the district court's exercise of jurisdiction because, she argues, it will result in piecemeal litigation that will rob defendants of finality and repose. That is a hollow argument from a recidivist offender. While I agree that district courts must not arbitrarily mete out punishment in the form of multiple revocations for the same conduct,[5] Wing's argument does not change my reading of the statute in question given her continued misconduct. The statutory scheme already contemplates multiple revocations of supervised release by recidivists like Wing and places a hard cap on the total amount of revocation-based imprisonment and further supervised release time that a district court can impose.

In Wing's case, she was convicted in 2001 of a Class B felony. *See* 18 U.S.C. § 656 (stating a maximum sentence of thirty years imprisonment for her initial bank embezzlement); 18 U.S.C. § 3559 (categorizing offenses punishable by twenty-five years to life imprisonment as "Class B" felonies). Under § 3583, Wing's authorized term of supervised release could not exceed five years for her Class B felony, *see* § 3583(b)(1), and the longest additional period she could be

---

[5]Such arbitrary revocations would still be reviewable for abuse of discretion.

forced to serve in prison based on a revocation of supervised release is three years. *See* § 3583(e)(3).

Because she was convicted in 2001, before the 2003 amendments to § 3583, Wing's aggregate period of imprisonment for any and all revocations of supervised release cannot exceed three years. *See United States v. Knight*, 580 F.3d 933, 937 (9th Cir. 2009) (citing *United States v. Jackson*, 329 F.3d 406, 407-08 (5th Cir. 2003) (collecting cases requiring aggregation of revocation-based imprisonment terms prior to 2003 amendments)). Thus, the district court's most recent revocation of Wing's supervised release—the second such revocation—would also be Wing's last: she was previously imprisoned for three months for her first revocation, and she was sentenced to an additional thirty-three months of imprisonment for her second when her crime spree was discovered. When released from the thirty-three-month period of imprisonment, she would have reached the statutory cap. She would no longer be subject to supervised release, imprisonment, or any other action by the district court in Montana. This statutory limit adequately protects Wing's interest in finality and repose, just as Congress intended.

## II

Our story resumes at a prison. The camera zooms in on two female inmates being processed out at the end of their incarceration. Serling's voice surfaces over this ominous scene.

> It's now July 18, 2017, at the Federal Correctional Institution in Dublin, California. As Michelle Wing prepares to conclude her Eastern District of Washington sentence, a fellow prisoner is also being processed for release.
>
> This other prisoner, Patty, has been serving three months on a revocation of supervised release.[6] Patty

---

[6] The majority tells us that 18 U.S.C. § 3624(e) makes it "clear" that Patty could not be on supervised release. The only thing clear about

made her presence felt during her short time on the cellblock. She is widely believed to have strangled two other inmates and left a third in a coma after delivering a savage beating.

There is a preponderance of evidence linking Patty to these crimes. But she's silenced all witnesses, and prosecutors have no choice but to withhold filing criminal charges.

The screen transitions to the setting of our final scene: the chambers of a federal district judge. Patty's parole officer, conscious of the violence she will undoubtedly wreak upon innocent victims, begs the district court to revoke Patty's upcoming period of supervised release. But in light of today's opinion, the district judge can do nothing.

Although the court had jurisdiction to punish petty violations before imprisonment, and may eventually have jurisdiction to punish the inevitable crimes committed after imprisonment ends, there is a black hole squarely in the center of Patty's otherwise-continuous period of supervised release. It is a zone the judge has helplessly observed since 2012. It is a void of time and space where congressional intent does not apply; where punishment for criminals and protection for victims is completely reversed. Welcome to this fifth dimension. Welcome to . . . The Twilight Zone.

---

§ 3624(e) is that it does not apply here. That section ensures that convicts do not get credit for supervised release while imprisoned for *new criminal convictions*. 18 U.S.C. § 3624(e) ("[S]upervised release does not run during any period in which the person is imprisoned in connection with a *conviction for a Federal, State, or local crime* . . . .") (emphasis added). Section 3624(e) has nothing to do with revocations of supervised release, which are not mentioned anywhere in the section's text. This explains why Wing's attorney failed to mention § 3624(e) upon direct questioning on this issue at oral argument.